In Wagner v. Retail Credit Co., 338 F.2d 598, 601, this court stated:

> "It is axiomatic that a litigant cannot present arguments in this court which it did not present to the court below. [Citing cases.]"

This "tortious act" theory was not presented to or acted upon by the trial court and cannot be properly considered here, The court's order allowing Salisbury's motion to dismiss the complaint as to him is

Affirmed.

**GENERAL INSURANCE AGENCY, INC., Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**Helen R. THROCKMORTON, Respondent.**

**Nos. 11869, 11870.**

United States Court of Appeals
Fourth Circuit.

Argued March 8, 1968.

Decided Sept. 9, 1968.

Louis H. Miller, Jr., Richmond, Va., for General Ins. Agency, Inc.

Robert I. Waxman, Atty., Dept. of Justice (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson and David O. Walker, Attys., Dept. of Justice, on brief), for Commissioner of Internal Revenue.

Carle E. Davis, Richmond, Va., for Helen R. Throckmorton.

Before BOREMAN and BUTZNER, Circuit Judges, and RUSSELL, District Judge.

BOREMAN, Circuit Judge:

These two cases were consolidated for hearing and disposition in the Tax Court as well as on review in this court. We affirm the decision below.

Certain of the material facts were stipulated and others were found by the Tax Court all of which will be hereinafter briefly stated. Helen R. Throckmorton (hereafter Helen,) the widow of R. W. Throckmorton, deceased, is the taxpayer in No. 11,870 and was a resident of Richmond, Virginia, at the time her petition was filed in the Tax Court. R. W. Throckmorton started an insurance agency in 1931. This business was incorporated in 1952 as R. W. Throckmorton, Inc., (hereafter Throckmorton) and dealt primarily with the sale of automobile, fire and casualty insurance from an office in Richmond, Virginia.

W. A. Spott was a nephew and an associate of Helen Throckmorton's husband in the insurance business for approximately thirteen years, serving as vice president and office manager of Throckmorton, but this relationship was terminated on November 1, 1958, when he went to work for General Insurance Agency, Inc., (hereafter General) the taxpayer in No. 11,869. Spott was serving as General's office manager at the time of trial. After Spott left the employment of Throckmorton Helen's husband became ill. A man named Nixon was hired to sell insurance for Throckmorton and to manage the office. Helen's husband died on December 8, 1959, and Nixon's employment with Throckmorton was terminated in February of 1960.

Upon the death of her husband Helen became the sole stockholder of Throckmorton. Very shortly thereafter, L. J. Duggan, president and a 50% stockholder of General and a lifelong friend of the Throckmortons, contacted Helen to inquire about acquiring the Throckmorton insurance agency business. Subsequently, with the authority of General, Spott occasionally assisted in straightening out the insurance activities of Throckmorton.

Helen held the position of secretary for Throckmorton and also served as a part-time bookkeeper. Her main occupation, however, was that of a real estate broker. She was also licensed to sell insurance but her activity in this area was limited to insurance on houses she sold as a result of her real estate brokerage business. Helen did not sell insurance for the Throckmorton agency and she did not possess the technical knowledge necessary to operate an insurance business.

Shortly after Nixon left Throckmorton in February of 1960, Helen discussed with Spott the possibility that he might take over the insurance business of Throckmorton by purchasing an interest therein. No agreement between them was reached. Spott informed Duggan about Helen's offer and the possibility that he might leave his employment with General to manage Throckmorton. Duggan desired to retain Spott as his employee and after they had discussed the matter Duggan decided to approach Helen again as to the possibility of General taking over the insurance business of Throckmorton. After several discussions among Helen, Duggan and others, an understanding was reached pursuant to which General was to purchase Throckmorton's insurance business. At this preliminary stage the components of the business to be sold were all the assets and liabilities of Throckmorton's insurance business and all of its books, records, files, and papers related to the business. Throckmorton's gross income from commissions was $21,496.00 in 1957, $22,372.00 in 1958, and $23,879.00 in 1959.

In the insurance business, "expirations" or "dailies," are copies of the agency's insurance policies in force and contain information which enables the agency to attempt to renew the policies upon expiration. The expirations, which belong to the agency, are valuable since they are a source of potential income and are transferable. When the expirations are being transferred the selling price of an insurance business is cus-

tomarily based on a computation of one and one-half times the gross annual commissions, or, for initial bargaining purposes, two times the net annual commissions.

After reaching a preliminary agreement as to the purchase price Helen contacted her attorney in order to have him prepare a written agreement of purchase and sale. Up to that time no request had been made, either by Duggan or by any other of the representatives of General, concerning a covenant by Helen not to compete in the insurance business nor had such a covenant been suggested or discussed. Helen's lawyer thought that she would derive some tax benefits in selling the business of the insurance agency if a covenant not to compete were one of the assets of Throckmorton transferred by the sale. A separate agreement which was to become an integral part of the over-all sales transaction was drafted by Helen's lawyer upon his sole initiative. The covenant not to compete was in the form of an agreement between Throckmorton and its stockholders and directors in order to give substance to the hope that such a covenant would constitute transferable property of Throckmorton for tax consequences favorable to Throckmorton and Helen. At that time Helen was the sole stockholder and a director of Throckmorton and the two other directors were Spott and one Thelma S. Myers, neither of whom had any financial interest in Throckmorton. By the terms of the contract the three directors purported to covenant and agree with Throckmorton that so long as they were stockholders or directors of Throckmorton they would not compete with Throckmorton in any business in which it was engaged during the time they were stockholders or directors or thereafter for a period of five years after they ceased to be stockholders or directors; further, they covenanted and agreed not to compete with Throckmorton's assigns or successors for a period of five years after all or any part of the business of Throckmorton was sold or transferred.

Thelma S. Myers, who did secretarial work for Throckmorton and did not sell insurance, and Spott were made nominal directors along with Helen for the purposes of the agreement. Although the agreement was dated March 1, 1960, it was actually executed as a part of the entire sales transaction by Throckmorton to General on March 25, 1960. Spott was employed by General at the time he was made such director and he had no knowledge whatever of his appointment as director prior to the time the agreement was executed.

The sale agreement described generally the property to be sold and acquired, namely, all the assets, properties and business of Throckmorton of every kind and description wherever located, including, without limitation, all property, tangible and intangible, accounts receivable, bank accounts, cash and securities, claims and rights under contracts of Throckmorton and all books and records of Throckmorton relating to its business. More specifically, the assets and property to be conveyed were described as follows:

"(a) Cash and accounts receivable not over ninety days old, the total of which shall be equal to the accounts payable assumed under this Agreement.

"(b) All office furniture and equipment located at 3122 West Clay Street, Room 207.

"(c) The agreement of the Corporation [Throckmorton] with its Officers and Stockholders not to compete with the Corporation or its successors or assigns for a period of five years."

The agreement of sale provided that Throckmorton would not dissolve until six months after the closing date of March 31, 1960, but reserved the right to Throckmorton to wind up its affairs at any time thereafter. A minimum consideration of $30,000.00 was provided, the terms of payment being described

in paragraph 10 of the written contract.[1]

The purchase and sale agreement and the agreement containing the covenant not to compete were executed on the same date and were considered by the parties as part of the same transaction. After the closing, the purchased assets of Throckmorton, including its insurance expirations, were moved to General's offices. The fair market value of the office furniture and equipment received by General in the transaction was $1,764.02.

Throckmorton had adopted a plan of complete liquidation on March 1, 1960, but dissolution did not occur until October 31, 1960, with assets worth $2,440.02 being distributed to Helen in addition to the contractual right by transfer and assignment to receive subsequent payments from General under the purchase agreement. Helen was not a party to the purchase and sale agreement between Throckmorton and General. Until the dissolution of Throckmorton payments by General were made to Throckmorton and these payments amounted to $4,269.00 in 1960. After Throckmorton's dissolution payments were made to Helen as assignee of the agreement with General. Helen received payments of $207.00 in 1960, $7,397.00 in 1961, and $7,281.00 in 1962. All of these payments were computed and paid on the basis of General's renewal commissions realized on Throckmorton's former policies in accordance with the sale contract.

For the tax years in question, namely, 1960, 1961 and 1962, General did not claim any deductions for amortizing the alleged cost of the covenant not to compete. It simply excluded from earned commissions the amounts paid to Throckmorton before its liquidation in 1960 and to Helen thereafter in the years in issue. Helen did not include in her tax returns any of the payments made to her in her reported gross income for any year.

In his notice of deficiency to General the Commissioner determined that the amounts paid by it to Throckmorton and Helen should be restored to income, and, accordingly, increased General's commission income by $4,477.00 for 1960, $7,397.00 for 1961, and $7,281.00 for 1962. In his deficiency notice to Helen the Commissioner increased her income by the same amounts, stating that the payments were for a covenant not to compete; alternatively, if such payments should be held not to have been made for a covenant not to compete, the Commissioner determined lesser deficiencies based upon including in income for each year the proportionate part of the payments that exceeded the fair market value of the contract when it was assigned by Throckmorton to Helen on October 31, 1960, upon liquidation.

The primary issue for decision is whether all amounts paid under the purchase and sale agreement during the years 1960, 1961, and 1962 over and above the $1,764.02, which was the fair market value of Throckmorton's office

1. "10. On the terms and subject to the conditions herein set forth, Buyer will pay to Seller on all renewals of policies now handled by Seller or which have been handed by Seller within twelve months prior to the date hereof, an amount equal to one-half of the commission which would be received by Buyer had such renewal been of the same kind and amount of coverage in force at the date of this agreement, or one-half of the commission actually received by Buyer, whichever shall be the lesser, for a period of four years and for such additional time not exceeding one more year, as may be required for said payments to equal the sum of $30,000. If the Seller has not received $30,000 at the end of the said fifth year, then Buyer will, within thirty days thereafter pay to Seller such amount as may be necessary to bring Seller's total receipts hereunder to $30,000. Commissions are earned when policies are renewed but are to be adjusted by return commissions applicable by reason of any policy or policies being cancelled or premiums being uncollectible. Buyer will render Seller a statement by the 15th of each month for the preceding month with payment for the period covered by the statement."

furniture and equipment at the time of the transfer, were for a covenant not to compete or were for intangible assets of Throckmorton, particularly the insurance expirations. The Tax Court found that General purchased from Throckmorton the insurance expirations, the principal asset of value, and not a covenant not to compete.

■ The determination of the question here is important taxwise to both the buyer and the seller. If the payments by General were for a covenant not to compete they would constitute ordinary income to Throckmorton and Helen and an amortizable expense to General. 26 U.S.C. (1964 ed.) § 167 (Internal Revenue Code of 1954, § 167 (a) (1) and (2)); Treasury Regulations on Income Tax (1954 Code) § 1.167(a)–3; 26 C.F.R. sec. 1.167(a)–3. However, generally, if such a covenant is not separately bargained and accounted for and is merely incidental to the transfer of the over-all business the seller will be entitled to capital gains treatment of the entire proceeds of the sale but the buyer will get no deduction. Hamlin's Trust v. C.I.R., 209 F.2d 761 (10 Cir. 1954), aff'g 19 T.C. 718 (1953); Lee Ruwitch, 22 T.C. 1053 (1954); Toledo Newspaper Co., 2 T.C. 794 (1943).

■ In determining whether the parties to the agreement actually contemplated a sale and purchase of a covenant not to compete, a question is presented as to whether they intended to allocate any part of the purchase price to such a covenant at the time they executed their formal sales agreement. This determination is basically one of fact, involving the ascertainment of the parties' intentions and motivations. With respect to this factual issue the taxpayer has the burden of proof. It is well established that a taxpayer who seeks the benefit of a deduction has the burden of proving that he is entitled to it. Helvering v. Taylor, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623

(1935); Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

It is clear in the instant cases that the parties attributed no value to the alleged covenant. The covenantors received nothing for their promises to refrain from competition. It was found that General made no request, during the contract negotiations, that a covenant not to compete be included in the sale and that Throckmorton was the party which included such agreement in the contract, not by its direction but upon the initiative of Helen's attorney. Furthermore, it is clear that the agreement not to compete had no economic value. Helen, one of the covenantors, and sole shareholder of Throckmorton, was never considered serious competition because of her inability to successfully manage an insurance agency. Spott, the other covenantor, was eliminated as serious competition when General purchased Throckmorton's assets and Spott was then in the employ of General. In any event, Spott's promise not to compete would be unenforceable for lack of consideration and, therefore, had no economic value over which prudent businessmen would bargain.

In view of the fact that the covenant had little or no value, the conclusion naturally follows that the purchase price of $30,000.00 must have been for the insurance expirations. In fact, the payments to be made by General were based upon a percentage of the commissions derived from the expirations.

General did not argue in the Tax Court and frankly admits on brief before this court that an allocation of the purchase price between the covenant and the expirations cannot be made. Moreover, the Tax Court found that there was no rational basis on which to do so even if that court had concluded that at least a part of the consideration was for the covenant.

■ The test or legal standard which we elect to apply in resolving this issue is what has been called the "economic

reality" test.[2] Both the Ninth and Third Circuits have held that the determination of whether a part of the purchase price represents payment for a non capital item, i. e., a covenant not to compete, depends upon whether the parties to the agreement intended to allocate a portion of the purchase price to such covenant at the time they executed their formal sales agreement.[3] It is necessary also to establish that the covenant "have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." Schulz v. C.I.R., 294 F.2d 52, 55 (9 Cir. 1961).

■■ The "economic reality" test is to be contrasted with a test seemingly favored by other Courts of Appeals which has been characterized as the "severable-non severable" rule. See Montesi v. C.I.R., 340 F.2d 97 (6 Cir. 1965); Barran v. C.I.R., 334 F.2d 58 (5 Cir. 1964); Ullman v. C.I.R., 264 F.2d 305 (2 Cir. 1959). These circuits take the position that if the covenant can be segregated in order to show that the parties were actually dealing with a separate item then so much as is paid for it is ordinary income. Stated in other words, whether any portion of the sales price is attributable to a covenant not to compete depends upon whether the parties treated the covenant as a separate and distinct item. In the instant cases the severable-non severable test, if it were to be applied, would reach

the same result as the economic reality test since it is clear that there was no specific allocation of any part of the sales price to this covenant. Thus, the Tax Court being faced with a situation where the parties seemingly wrote a covenant not to compete in the sales contract without a specific allocation of any part of the purchase price to it, it was proper for that court to ascertain the true intent of the parties to the contract and construe the entire contract in light of that intent. In the context of the instant cases the Tax Court made findings with respect to the true substance and economic realities of the transaction and, having done so, its findings should not be disturbed unless shown to be clearly erroneous. Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Jones v. C.I.R., 357 F.2d 644 (6 Cir. 1966), *per curiam*; Fuller v. C.I.R., 313 F.2d 73 (6 Cir. 1963). The evidence is so patently one-sided as to make the Tax Court's conclusions correct without question. The negotiations between General on the one hand and Throckmorton on the other affirmatively establish that the parties never bargained over the covenant not to compete and never intended that it be included as an element of value in the over-all purchase price. The factual conclusions of the Tax Court with respect to the substance of the sale are based upon a record replete with supporting evidence.

The tax consequences were determined by the Tax Court consistent with its determination of the principal issue.[4]

---

2. Fulton Container Co. v. United States, 355 F.2d 319 (9 Cir. 1966); Levine v. C. I. R., 324 F.2d 298 (3 Cir. 1963); Annabelle Candy Co. v. C. I. R., 314 F.2d 1 (9 Cir. 1962).

3. Fulton Container Co v. United States, 355 F.2d 319 (9 Cir. 1966); Levine v. C. I. R., 324 F.2d 298 (3 Cir. 1963); Annabelle Candy Co. v. C. I. R., 314 F.2d 1 (9 Cir. 1962). See also Delsea Drive-In Theatres, Inc. v. C. I. R., 379 F.2d 316, at page 317 (3 Cir. 1967), where the court stated the principle as follows:

As it [the Tax Court] points out in its opinion, although the parties may have

considered the agreement not to compete to be valuable, " 'if the parties did not intend that a part of the purchase price be allocated to * * * [an] important and valuable covenant, that intention must be respected.' * * *."

4. Taxpayer Helen R. Throckmorton, respondent in No. 11,870, raises no issue on review with respect to the Tax Court's determination that, to the extent the payments in issue were for insurance expirations, a proportionate part of each payment was includable in her taxable income.

We find it unnecessary to discuss these in detail and the decision of the Tax Court is affirmed in all particulars.

Affirmed.