MARYLAND NATIONAL BANK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Maryland Nat'l Bank v. Commissioner
Docket No. 5114-72
United States Tax Court
T.C. Memo 1974-209; 1974 Tax Ct. Memo LEXIS 108; 33 T.C.M. (CCH) 936; T.C.M. (RIA) 74209; August 13, 1974. *108 In 1967 petitioner, a national banking association, acquired a retail credit card business as a going concern including its goodwill. A separate clause in the agreement of sale provided as a condition to closing that the seller would convey covenants not to compete executed by it and by such of its directors as the petitioner should request. The agreement of sale did not allocate any portion of the purchase price to a particular asset. Held : Under the economic reality test, petitioner has failed to show by a preponderance of the evidence that the contracting parties intended to allocate any part of the consideration to the covenants. In addition the covenants had minimal economic value. Therefore the portion of the purchase price in dispute is not assignable to the covenants and consequently not amortizable under sec. 167(a) (1), I.R.C. of 1954. George D. Hubbard, for the petitioner. Howard L. Williams and Robert S. Erickson, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge : Respondent determined deficiencies of $58,845.87 and $86,776.45 in the income taxes of the Maryland National Bank for the calendar years 1967 and 1968, respectively. After concessions with respect to other issues, only one question remains for our decision: whether $156,375, or any portion thereof, of the purchase price paid by petitioner in 1967 to acquire the business of Charg-It of Baltimore is allocable to covenants not to compete. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations and attached exhibits are incorporated herein by this reference. Maryland National Bank (hereinafter petitioner or Bank) is a national banking *110 association incorporated under the laws of the United States with its principal office in Baltimore, Maryland. During the years 1967 and 1968, the Bank engaged in a general commercial banking, consumer banking, and trust business in the State of Maryland. It regularly kept its records and filed its federal income tax returns on the accrual method of accounting. The petitioner filed its income tax returns for the years in issue with the district director of internal revenue in Baltimore, Maryland. During the latter part of 1966 and the early part of 1967, the Bank engaged in negotiations with Charg-It of Baltimore (hereinafter Charg-It), which was then, and had been for 14 years, engaged in the retail credit card business primarily in the Baltimore area. This business consisted of the purchase by Charg-It of accounts receivable from retail merchants at a discount, where the purchaser of the merchandise giving rise to the accounts receivable was the holder of a credit card issued by Charg-It, and the collection of such accounts receivable. The Bank entered into these negotiations with a view to acquiring the business of Charg-It so that the Bank could enter the retail credit *111 card business, a business in which it was not then engaged. The negotiations on behalf of the Bank were carried on solely by William F. Melville, Jr. (hereinafter Melville), a vice president in charge of consumer banking, and on behalf of Charg-It solely by Philip L. Kling (hereinafter Kling), the founder, president, and a director of Charg-It. It was finally determined that the "ground rules" for acquisition would be cash. This was based on a purchase of the physical and intangible assets listed on Charg-It's January 31, 1967 balance sheet and a premium over the book value of these various assets. As a result of these negotiations, the Bank received an offer from Charg-It in the form of a letter dated March 17, 1967. In pertinent part the letter read: The Board of Directors of Charg-It of Baltimore, Inc., has met today and, subject to final approval of our stockholders, approved an agreement which will be entered into for the sale of all assets of the Company to Maryland National Bank for $2,568,210.00, except for the loan receivable from subsidiary [Charg-It of Florida], interest receivable from subsidiary, and stock of subsidiary. The Bank shall assume all liabilities *112 shown on the balance sheet as of the settlement date except a portion of the loan from Equitable * * *. It is understood that there will be mutually agreed upon employment contracts signed by me [Philip L. Kling] and certain other key people of Charg-It which will also include an agreement that we will not compete with the Bank. The Bank and Charg-It entered into a written agreement dated April 14, 1967. This agreement (hereinafter Agreement), in relevant part, provided: 1. Sale of Assets : Seller agrees that at the closing, Seller shall sell, transfer and deliver to the Buyer, for the consideration hereinafter provided, all of the assets of the Seller then existing and all its business as a going concern, * * * including, * * * all of Seller's goodwill * * * * * * 12. Covenant Not to Compete. It is further an express condition to closing that Seller will obtain and deliver to Buyer a covenant executed by it, and by such of the Officers and Directors of Seller as may be selected by the Buyer covenants executed by them * * * and that, for a period of five years after the closing, that such employees and the Seller will not in any manner, directly or indirectly, compete *113 with or become interested in any competitor of the Buyer * * *. On the date of the Agreement, Charg-It was a publicly held corporation owned by 350 shareholders. closing of the sale contemplated by the Agreement took place on May 1, 1967. The Bank paid $2,568,210 in cash to Charg-It at the closing, and it assumed liabilities of Charg-It in the amount of $1,963,995.08. The total purchase price was therefore $4,532,205.08. Petitioner and respondent agree that the total purchase price is allocable to specific items as follows: Value of assets on balance sheet
$3,205,474.77
Total premium on accounts receivable
400,000.00
Goodwill
770,354.00
4,375,828.77
Since the parties stipulated that at least $770,354 is allocable to intangible assets in the nature of goodwill, $156,376.31 [1] of the total purchase price of $4,532,205.08 is left unallocated. During the negotiations covenants not to compete were requested by petitioner from the officers *114 and directors of Charg-It before a purchase price had been agreed upon. There was minimal discussion about the covenants. Melville maintained at trial that the Bank would not have purchased the business of Charg-It without obtaining the covenants not to compete from the corporation, Kling, and the other directors. The Bank received an instrument dated May 1, 1967, executed by Charg-It and by all of Charg-It's directors containing the covenants as required by paragraph 12 of the Agreement. This instrument contained the following provision: "[For] or a period of five (5) years after May 1, 1967, we and each of us will not in any manner, directly or indirectly, compete with, or become interested in any competitor of, Maryland National Bank which is engaged primarily in the State of Maryland in the field of business in which Charg-It of Baltimore was engaged on April 14, 1967 * * *." None of the members of the board of directors, including Kling, received any money or other consideration from Charg-It or petitioner for the signing of the covenants not to compete. In addition none of the signers of the covenants reported any ordinary income arising out of the execution of said *115 covenants.
Contemporaneous with the negotiations for the sale of assets of Charg-It, Kling and Melville negotiated a consultant contract between Kling and petitioner. The employment contract was brought up early in the negotiations and completed at the same time the negotiations for the sale of assets were completed. The contract provided that Kling would spend 9 months the first year and 5 months the second year working for petitioner. The third year of the contract, which ended April 30, 1970, required Kling to be available for consulting services as requested. At the time it acquired the assets of Charg-It, the Bank was the first and only bank in the Baltimore area engaged in the retail credit card business. At that time its only competition in the area was provided by one local firm. It was well known to both the Bank and Charg-It during their negotiations that there were at that time several large so-called "national" retail credit cards being aggressively promoted by certain of the larger banks, such as BankAmericard program of the Bank of America and the Interbank (Master Charge) card. The Bank had been actively considering the possibility of obtaining a franchise *116 from Bank of America until just prior to its acquisition of Charg-It. One of the main reasons why the directors of Charg-It decided to sell their business to the Bank was the threat of competition from the national bank-operated retail credit cards, which had far greater access to capital funds than did Charg-It. Kling founded Charg-It in 1953 and had been in the retail credit card business in Baltimore as the chief executive officer of Charg-It for 14 years at the time of the acquisition by the Bank. His duties were executive and supervisory. The other directors and officers devoted a limited amount of time to their positions. With one exception the other directors were men of considerable business experience in the Baltimore area. At the time the Bank acquired the business of Charg-It, Kling was, and had been for a number of years, suffering from a progressive muscular disease. However, this disease did not prevent him from carrying out fully his duties as president of Charg-It at any time prior to the acquisition of its business by the Bank. Despite the disease, Kling was able to complete his duties under his employment agreement with the Bank after the acquisition. *117 He has since been engaged in the overall executive managment of the affairs of Charg-It of Florida, which engages in the retail credit card business in Florida. At the time of the sale, Kling had received medical advice to cut down on his work and not overtire himself. Subsequently he cut his business week to 3 days. There was no understanding or agreement between the Bank and Charg-It, either in the Agreement or otherwise, allocating any portion of the purchase price to any specific asset acquired by the Bank as a result of that purchase. During the negotiations preceding the acquisition, there was no suggestion by either party that any such allocation should be made. Harry F. Wright, Jr., the comptroller and chief financial officer of the Bank at the time of acquisition of Charg-It began early in April of 1967 and prior to the signing of the Agreement to consider what portion of the purchase price to be paid by the Bank for the business of Charg-It should be allocated to the covenants not to compete. He and personnel in his department did research to try to find a method or formula for making such an allocation.He concluded that this was a question of judgment and could *118 not be done by formula. In an internal Bank memorandum dated May 8, 1967, Wright placed a value on the covenants of $156,375, which is the value that the Bank used on its books and in preparing its federal income tax returns for 1967 and subsequent years. Petitioner computed the value for the covenants in the following manner: 801
(existing number of accounts)
450
(estimated number of new accounts for the next 5 years)
1,251
$125
(value of annual membership fee from each merchant for 5 years, $25 per annum)
$156,375
Petitioner estimated that 450 new accounts would be acquired during the first 5 years subsequent to the purchase of Charg-It. This was based upon an average of 90 new accounts per year. Subsequent to the closing on May 1, 1967 Charg-It was liquidated and dissolved. Upon that liquidation, the shareholders who did not sign the covenants received the same distribution per share as the shareholders who did sign them. OPINION The sole issue to be decided is what portion of $156,375, if any, is allocable to covenants not to compete which the petitioner obtained from Charg-It and certain of its officers and directors pursuant to acquiring *119 Charg-It's credit card business in the Baltimore area. According to the petitioner, the covenants were an important and bargained-for element of value in the purchase of the business. Petitioner contends that the contracting parties had intended that a portion of the purchase price be allocated to the covenants at the time they entered into the Agreement, that the covenants had been treated in the bargaining process as a separate item, and that the covenants had real economic value. Taking a contrary position, the respondent asserts that the $156,375 in dispute, in addition to the $770,354 stipulated, is properly assignable to good will and the going concern value of Charg-It. Section 167(a) of the Internal Revenue Code of 1954[2] provides that: "There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, * * *." With respect to the depreciation of intangible property the regulations state: "If an intangible asset *120 is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject for a depreciation allowance * * *. No deduction for depreciation is allowable with respect to goodwill." Section 1.167(a)-3, Income Tax Regs.
The resolution of the question at hand - whether goodwill acquired in the purchase of Charg-It should be valued at $770,354 or at $926,729 or at some intermediate amount - will have important tax consequences for both the petitioner and the covenantors. It is well established that amounts paid for goodwill result in capital gain to the seller with the purchaser acquiring an intangible asset that may not be amortized. General Insurance Agency, Inc. v. Commissioner, 401 F.2d 324 (4th Cir., 1968), affirming a Memorandum Opinion of this Court. Section 1.167(a)-3, Income Tax Regs.
*121 On the other hand, amounts paid for a covenant not to compete are ordinary income to the covenantor since they are tantamount to payments for services. J. Leonard Schmitz 51 T.C. 306, 313 (1968), affd. sub nom. Throndson v. Commissioner, 457 F.2d 1022 (9th Cir., 1972). The purchaser in that event would amortize the cost of the covenant over its specified term. In support of his argument, respondent attempts to invoke either the rule adopted in Commissioner v. Danielson, 378 F.2d 771 (3rd Cir., 1967), vacating and remanding 44 T.C. 549 (1965) (proof admissible in an action between the parties) or the judicial analysis found in Ullman v. Commissioner, 264 F.2d 305 (2nd Cir., 1959), affirming 29 T.C. 129 (1957) (so-called strong proof rule). Both of those cases, in contrast to the present controversy, involved contracts in which a specific amount was expressly allocated to covenants not to compete, and the question before the court was what degree of proof was required before one party could overcome the contractual allocation. Since the parties at bar did not allocate any amount, not even zero, *122 to the covenants, they are not now attempting to vary the language of the Agreement. Consequently, we find both the strong proof test of Ullman and the Danielson rule inapplicable. The Fourth Circuit, to which this case would go in the event of any appeal, has adopted the "economic reality test" in determining whether any amount received on the sale of a business, where a specific designation in the contract is not made, represents payment for covenants not to compete. General Insurance Agency, Inc., supra. The court defined the test as follows: "[The] determination of whether a part of the purchase price represents payment for * * * a covenant not to compete, depends upon whether the parties to the agreement intended to allocate a portion of the purchase price to such covenant at the time they executed their formal sales agreement. It is necessary also to establish that the covenant have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement. *123 "" General Insurance Agency, Inc., supra, at 330. As instructed by the foregoing case we will therefore make two inquiries in ascertaining the applicability of the economic reality test: (1) Was there a bilateral intention to allocate part of the purchase price to the covenants not to compete at the time the contract of sale was executed; and (2) do the covenants have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for them. See also Rich Hill Insurance Agency, Inc., 58 T.C. 610, 617 (1972). These determinations are essentially ones of fact, and the taxpayer has the burden of proof. We hold that the petitioner has failed to sustain its burden of proof on both aspects of the economic reality test. While no particular fact is determinative, there are several factors present in this case which support our conclusion that no consideration was paid, or intended to be paid, for the covenants. Furthermore, we are particularly convinced that the covenants were of little economic value to the petitioner. *124 The failure of the contracting parties to allocate a part of the consideration to the agreements not to compete, although not conclusive by itself, is strong evidence that no such allocation was in fact intended. Delsea Drive-In Theatres, Inc. v. Commissioner, 379 F.2d 316 (3rd Cir., 1967), affirming per curiam T.C. Memo. 1966-6. Unlike the negotiations in Harry A. Kinney, 58 T.C. 1038 (1972), there was never any discussion between Melville and Kling at any time regarding an assignment of $156,375, or any other value, to the covenants. The lack of any discussion in the negotiations with respect to an allocation of consideration to the covenants suggests that Melville refrained from ascribing a value to them for fear that Kling would object. Annabelle Candy Co. v. Commissioner, 314 F.2d 1 (9th Cir., 1962). On the whole we think the petitioner has failed to sustain its burden of proving that, notwithstanding the absence of an explicit recital in the Agreement, the parties implicitly intended to allocate a portion of the purchase price to the covenants. In further support of *125 our conclusion disallowing petitioner's amortization deductions, the circumstances of this case indicate that the covenants were of minimal economic value to the petitioner. Schulz v. Commissioner, 294 F.2d 52 (9th Cir., 1961). We think Kling's decision to sell the credit card business in Baltimore was realistically irrevocable, and so the covenants were unimportant, meaningless appendages to the Agreement of sale. One of the main reasons why the board of directors of Charg-It sold the business was the threat of competition from national, bank-operated credit cards. Since the credit card business is essentially a financing agreement, the entry of large banks with their direct and usually less expensive access to capital funds signaled an uncertain, if not bleak, future for smaller companies. It was precisely this reason that prompted Kling to renew negotiations with petitioner and substantially lower his asking price. Since Kling was anxious to sell the business in the face of a growing trend towards national bank credit cards, it seems improbable that he would later reverse his appraisal of the situation and attempt to re-enter the business. [3] See Harry A. Kinney, supra. *126 Assuming arguendo that competition from Kling was a meaningful possibility, the petitioner has failed to show that the covenants not to compete and the employment agreement did not provide redundant legal protection, at least during the first 3 years following the sale. That redundancy reduces any economic significance that could be attributed to the covenants alone. Finally, Kling's health raised additional doubts about future efforts he might make in competition with the Bank. The potential for competition from the other directors besides Kling was slight. They were unknowledgeable about the business, spent only a few minutes a year on the affairs of Charg-It, and had substantial other business interests in areas unrelated to credit cards which consumed most of their time. That the covenants were of nominal value is also supported by the fact that the subsequent liquidation of Charg-It, pursuant to section 337, was pro rata without regard to whether the distributee was also *127 a covenantor. Rinehard Oil News Co. v. Commissioner, 369 F.2d 692 (5th Cir., 1966), affirming a Memorandum Opinion of this Court. In conclusion, we think the record shows that there was not a bilateral intention to allocate a portion of the purchase price to the covenants not to compete and that there was not sufficient "business reality" to induce reasonable men to bargain for such covenants. Schulz, supra. It follows that we hold that petitioner is not entitled to allocate any portion of the $156,375 to the covenants not to compete and hence its claim for amortization deductions must be denied. Decision will be entered under Rule 155. Footnotes
1. $4,532,205.08 minus $4,375.828.77 equals $156,376.31. Due to rounding, the parties stipulated that no part of the purchase price in excess of $156,375 is allocable to the value of the covenants not to compete. ↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
3. The trend towards "nationalization" of credit cards continued subsequent to the sale of Charg-It. In 1968, petitioner became affiliated with the national credit card of Master Charge. ↩