598 S.E.2d 310

**Patricia Houston MESSER, Respondent/Appellant,**

v.

**John A. MESSER, III, Appellant/Respondent.**

No. 3825.

Court of Appeals of South Carolina.

Heard Jan. 13, 2004.

Decided June 14, 2004.

Rehearing Denied August 26, 2004.

616

S. Allan Hill, of Greenville; for Appellant/Respondent.

William B. Swent, of Greenville; for Respondent/Appellant.

HOWARD, J.:

Patricia Houston Messer ("Wife") brought this contempt action against her former husband, John A. Messer, III ("Husband"), to collect alimony payable under a separation agreement incorporated into the parties' final divorce decree.

After multiple hearings, the family court ruled: 1) income should be imputed to Husband for his voluntary underemployment; 2) Husband improperly classified income derived from the sale of his business under a covenant not to compete as capital gains, thus shielding the income from the alimony formula contained in the agreement; 3) Husband was responsible for Wife's attorney's fees; and 4) Wife waived her right to additional alimony for the period prior to 1997. Both parties appeal. We affirm in part, reverse in part, and remand.

## FACTUAL/PROCEDURAL BACKGROUND

Wife and Husband were married in 1960 and separated in 1982. They had two minor children when they separated, a son, fourteen years of age, and a daughter, ten years of age.

The parties entered into a separation agreement later approved and incorporated into the final divorce decree. In pertinent part, the decree provided Husband would pay Wife $1,200 per month in alimony and $250 per month in child support for each child during their minority. Thereafter, when the children graduated from high school, they each had two years in which to begin college, during which the child support obligation continued. Once they entered college, child support payments for each child decreased to $100 per month and ceased once each child had been given the opportunity to complete at least four years of college or post-graduate study.

Once child support payments ceased under the formula above, Husband's alimony payments became subject to an alimony formula. Pursuant to the formula, Husband was to pay thirty percent of the first $85,000 of his adjusted gross income, excluding capital gains, and ten percent of his income as so defined over $85,000. Furthermore, the formula provides, "in no event . . . [shall Husband pay] less than Sixteen

Thousand ($16,000.00) per year, nor more than Twenty Nine Thousand Five Hundred ($29,500.00) Dollars per year."[1]

The alimony formula contained a second, limiting clause ("the seventy-five percent clause") providing as follows:

That because of any future changes in federal tax structure or the economic or physical conditions affecting the husband, he, at no time, under the payment schedules set forth above, shall pay more than Seventy Five (75%) percent of his annual income after Federal and State Taxes, FICA deductions, and child support payments are deducted.

At the time of separation, Husband was a salaried employee in his father's mirror manufacturing company, Messer Mirror, earning $42,000 per year. By 1988, through purchase and inheritance of the company's stock, the Husband controlled the company and owned a fifty-seven percent interest in it. In 1988, the Husband sold Messer Mirror to Messer Industries, a newly formed company owned by outside interests, under an Asset Purchase Agreement for a total acquisition price of $6.5 million. As a part of the purchase agreement, Messer Industries agreed to pay Husband $1.5 million as consideration for a five-year covenant not to compete.

In the ensuing years, Husband declared each payment under the covenant as capital gain, rather than ordinary income, thereby shielding the income from the alimony formula. He also invested his proceeds from the sale in investments yielding non-taxable income. Because payments were temporarily discontinued during a dispute between Messer Industries and the Husband, he will continue to be paid $66,766 per year through 2007.

After Husband discontinued child support, he ceased making alimony payments because his ordinary income was so low no alimony was payable under the seventy-five percent clause. Subsequently, Wife filed a petition seeking a rule to show cause, arguing the seventy-five percent clause was inapplicable and Husband's ordinary income was artificially low.

---

1. Thus, any amount exceeding $125,000 cannot be subject to the alimony formula, as ordinary income of $125,000 will trigger the maximum alimony provision contained within this clause.

Husband moved to dismiss the action because the agreement incorporated into the decree contained an arbitration provision. The family court dismissed the petition, ruling the action must be arbitrated. Thereafter, Wife appealed to this Court, and this Court reversed and remanded, ruling the arbitration clause was unenforceable.[2]

Upon remand, the family court: 1) ruled Husband was liable for unpaid alimony and interest accruing after August 1997; 2) ruled Wife waived her claim for alimony for the period prior to August 1997; and 3) awarded Wife attorneys' fees. Both parties appeal.

## STANDARD OF REVIEW

In appeals from the family court, this Court has authority to find the facts in accordance with its own view of the preponderance of the evidence. *Woodall v. Woodall*, 322 S.C. 7, 10, 471 S.E.2d 154, 157 (1996). This broad scope of review, however, does not require us to disregard the findings of the family court. *Stevenson v. Stevenson*, 276 S.C. 475, 477, 279 S.E.2d 616, 617 (1981). Rather, we are mindful that the trial judge, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *McAlister v. Patterson*, 278 S.C. 481, 483, 299 S.E.2d 322, 323 (1982).

## ISSUES PRESENTED

**I. Husband's Appeal**

 **A. Did the family court err by ruling Husband violated the covenant of good faith and fair dealing?**

 **B. Did the family court err by reclassifying income derived from the covenant not to compete as ordinary income?**

 **C. Did the family court err by imputing income to Husband?**

 **D. Did the family court err in its interpretation of the seventy-five percent clause?**

---

**2.** *Ex Parte Messer*, 333 S.C. 391, 509 S.E.2d 486 (Ct.App.1998).

 E. **Did the family court err by awarding Wife attorneys' fees?**

## II. Wife's Appeal

 A. **Did the family court err by ruling Wife waived her right to additional alimony under the alimony formula accruing prior to 1997?**

## LAW/ANALYSIS

### I. Husband's Appeal

## A. Did the family court err by ruling Husband violated the covenant of good faith and fair dealing?

■ Husband argues the family court erred by ruling he violated the covenant of good faith and fair dealing by minimizing his ordinary income and thus his alimony obligation.[3] We agree.

■ In the enforcement of an agreement, the court does not have the authority to modify terms that are clear and unambiguous on their face. *Ebert v. Ebert*, 320 S.C. 331, 338, 465 S.E.2d 121, 125 (Ct.App.1995).

At the time of the decree, Husband was a salaried employee in his father's mirror manufacturing company, Messer Mirror, earning $42,000 per year. By 1988, through purchase and inheritance of the company's stock, Husband owned a fifty-seven percent controlling interest in the company. Subsequently, Husband sold Messer Mirror to Messer Industries, a newly formed company owned by outside interests. As part of the purchase agreement, Messer Industries agreed to employ Husband for five years as president at a compensation of $86,000 per year, comprised of a salary of $80,000 and a car allowance valued at an additional $6,000 per year.

In 1996, Husband's salaried position with Messer Industries was terminated. Thereafter, he did not seek another salaried position. Instead, Husband started Continental Marketing to market furniture. He organized and managed Continental's

---

**3.** The family court applied the contractual doctrine of good faith and fair dealing to the provisions of the decree. Neither party has argued the family court erred in this respect. Thus, this is the law of the case.

finances to avoid paying ordinary income to himself, where possible. Although other members of his family work in the business and receive ordinary income, he does not. At the same time, many of his living expenses, such as automobile, medical and dental bills, are paid through the company without incurring ordinary income subject to the alimony formula.

As a result of these events, Husband claimed his adjusted gross income, excluding capital gains, fell below the minimum amount triggering alimony under the alimony formula, thereby eliminating his alimony obligation in each subsequent tax year.

In its final order, the family court acknowledged Husband's management and tax reporting of Continental's finances may be "technically legal and indeed may well constitute wise tax planning." Nevertheless, the family court ruled Husband voluntarily and purposefully decreased the amount of his ordinary income to avoid paying alimony. Thus, the family court held that by minimizing his tax consequences in the manner described above, Husband acted in bad faith.

We agree with Husband's argument that under the plain terms of the agreement and the decree, he has not acted in bad faith by minimizing his tax consequences, even though it has the effect of decreasing the Wife's alimony. The decree specifically bases the alimony formula on the ordinary, taxable income of Husband as determined for federal income tax purposes, excluding capital gain. This provision is not hidden, implied, or difficult to understand. It is expressly stated, and is policed by the Husband's certification to the Internal Revenue Service as to the correctness of his reporting and by his obligation to provide a copy of his returns each year to Wife. Unequivocally, this was the bargain Wife made. Therefore, we do not agree with the court's finding of bad faith where the structure and reporting of income was not found to be legally improper.[4] There is nothing in the wording of the agreement or the decree requiring Husband to forego tax saving advantages merely because they have the effect of decreasing his ordinary income to the disadvantage of Wife.

---

4. To the extent the family court ruled Husband acted in bad faith by transferring income-producing assets to his new Wife, Husband has not appealed this issue. Thus, it is the law of the case.

B. Did the family court err by reclassifying income derived from the covenant not to compete as ordinary income?

■ Husband next argues the family court erred by reclassifying income derived from the covenant not to compete as ordinary income subject to the alimony formula. We disagree.

Initially, we note, the family court placed the burden of proving the payments were properly considered as capital gains under existing tax law on Husband as the "taxpayer." Although Husband would have the burden of proof under the tax code,[5] see General Ins. Agency, Inc. v. Commissioner, 401 F.2d 324, 329 (4th Cir.1968), this is not a tax case. Rather, this is an action by Wife asserting Husband has violated the decree. Therefore, it is Wife's burden to establish facts demonstrating a violation of the decree to provide a prima facie case of noncompliance. See Brasington v. Shannon, 288 S.C. 183, 184, 341 S.E.2d 130, 131 (1986) ("In a proceeding for contempt for violation of a court order, the moving party must show the existence of the order and the facts establishing the respondent's noncompliance. The burden then shifts to the respondent to establish his defense and inability to comply with the order.") Wife had the burden of establishing a prima facie violation of the decree. Thus, we conclude the family court erred by placing the burden of proof on the Husband, as it would be under the tax code. Notwithstanding this error, we conclude Wife met her burden of proving the Husband improperly reported this income as capital gains.

■ When determining the tax consequences of payments received under a non-compete covenant, the U.S. Court of Appeals for the Fourth Circuit applies what has been termed the "economic reality" test. General Ins. Agency, 401 F.2d at 329–30. Under this test, a court must: (1) look to the parties' purchase agreement and determine whether they "intended to allocate a portion of the purchase price to such covenant at the time they executed their formal sales agreement;" and (2) look

---

5. The tax court's degree of scrutiny depends on the nature of the relationship between the parties to the business asset sales agreement. Where the parties do not have tax consequences adverse to each other in the transaction, the tax court strictly scrutinizes an allocation of the purchase price in a business asset sale. Bemidji Distributing Co., Inc. v. Commissioner, 82 T.C.M (CCH) 677 (U.S.Tax Ct.2001).

to the "business reality" of the transaction, determining whether the covenant not to compete would have real economic benefit to the acquiring entity, indicating its terms were negotiated independently of the overall sale price of the company being acquired. If both prongs of the test are satisfied, payment for the non-compete covenant must be treated as ordinary income for income tax purposes. *Id.*

The factors to be considered in the application of the economic reality test include: "(a) The grantor's (i.e., covenantor's) business expertise to compete; (b) the grantor's intent to compete; (c) the grantor's economic resources; (d) the potential damage to the buyer posed by the grantor's competition; (e) the grantor's contacts and relationships with customers, suppliers, and other business contacts; (f) the duration and geographic scope of the covenant; (g) enforceability of the covenant not to compete under State law; (h) the age and health of the grantor; (i) whether payments for the covenant not to compete are pro rata to the grantor's stock ownership in the company being sold; (j) whether the payments under the covenant not to compete cease upon breach of the covenant or upon the death of the grantor; and (k) the existence of active negotiations over the terms and value of the covenant not to compete." *Thompson v. Commissioner,* 73 T.C.M. (CCH) 3169 (U.S.Tax Ct.1997); *see Beaver Bolt, Inc. v. Commissioner,* 70 T.C.M. (CCH) 1364 (U.S.Tax Ct.1995).

The evidence within the record indicates Husband and his father created Messer Mirror sometime around 1967, and by 1988, Husband was the controlling stockholder and president of Messer Mirror. That same year, Messer Industries agreed to purchase Messer Mirror. The agreement contained three main documents—the asset purchase agreement, the employment agreement, and the covenant not to compete.

The asset purchase agreement provided Messer Industries would pay two million dollars, pro-rata, to Messer Mirror's stockholders for the purchase of Messer Mirror. Additionally, the agreement provided Messer Industries would pay 1.5 million dollars solely to Husband for a covenant not to compete, the sums being segregated within the document. The asset purchase agreement then provided a covenant not to compete, which prohibited Husband from engaging in any

investment, consulting, or advising of any company engaging in business involving mirror and glass production. Furthermore, the covenant contained a liquidated damages clause, wherein Husband agreed to pay 1.5 million dollars for a breach of the covenant, along with any equitable remedies Messer Industries may choose.

The employment agreement provided Messer Industries would employ Husband as president for five years at a salary of $86,000 per year, including a car allowance. Additionally, the agreement contained a covenant not to compete prohibiting Husband from engaging in or performing any services for any company that competed with Messer Industries or any of their subsidiaries. Furthermore, the agreement contained a damages provision stating breach of the agreement permitted Messer Industries to bring a suit in law or equity to recover its damages.

Husband also signed an additional document entitled "Noncompetition Agreement." The noncompetition agreement prohibited Husband from engaging or assisting another to engage in the business of glass or "any business that substantially competes with the business of . . . [Messer Industries]." The agreement also provides Husband shall be paid 1.5 million dollars as compensation. Furthermore, the agreement provides the remedies for its breach are monetary damages, a temporary restraining order, a preliminary injunction, a permanent injunction, the right to withhold future payments under the agreement, or a combination of some or all of the above.[6]

Viewing this evidence in light of the economic realities test, we conclude the family court properly reclassified the income derived from the covenant not to compete as ordinary income. First, the payments for the covenant not to compete were segregated from payment for the stock purchase. Furthermore, and most importantly, only Husband received payments for the covenant not to compete. Second, the evidence indi-

---

6. We note, the covenant not to compete provides the payments to Husband continue even if he dies prior to the expiration of the five-year life of the covenant. Husband argues this fact weighs in favor of classifying the covenant's income as capital gain. However, the covenant also provides payments will cease upon a breach, a fact weighing in favor of classifying the income as ordinary.

cates the covenant had a real economic benefit to Messer Industries, reflected by the separate, multiple, overlapping covenants, prohibiting different conduct by Husband and the amount of the liquidated damages provision found within the asset purchase agreement.[7]

Lastly, the evidence indicates Husband posed a real economic threat to Messer Industries if he chose to compete, as the evidence indicates he, along with his father, built Messer Mirror, and, at the time of purchase, occupied the positions of president and controlling stockholder. He possessed vast knowledge of the market, including customers and suppliers, and access to Messer Industries inside information. Furthermore, no evidence exists indicating Husband's age or health would prevent him from competing.

Based on these facts, we hold the weight of the evidence indicates the income derived from the covenant not to compete is ordinary income. Thus, we come to the same conclusion as that reached by the family court, that the income should be considered ordinary income and not capital gain for purposes of calculating alimony under the agreement.

## C. Did the family court err by imputing income to Husband?

Husband argues the family court erred by imputing income to him because: 1) as a matter of construction of the decree, the decree permitted Husband to cease working entirely; and 2) the amount of income the family court imputed to him for his earning capacity was excessive.

### 1. Construction of the Decree

■ Husband argues the family court erred, as a matter of construction of the decree, by imputing income to him for purposes of the alimony calculus. Husband contends the

---

7. Husband contends the document entitled, "Noncompetition Agreement" had no real economic benefit to Messer Industries, as Husband was already bound by covenants not to compete in both his employment agreement and the asset purchase agreement. However, we find this argument unconvincing, as the covenants not to compete found in the employment agreement and the asset purchase agreement prohibit different conduct by Husband and provide different remedies for their breach.

decree does not require him to work, and thus, imputation of income to him impermissibly expands the provisions of the decree. We disagree.

In support of his position, the Husband cites to the unofficially published Ohio Court of Appeals, Ninth Circuit, case of *Maher v. Maher*, 1999 WL 1059674 (Ohio Ct.App.1999).[8] Assuming arguendo the case has any precedential value, we conclude the facts of the case are vastly different from those in this case.

In *Maher*, the husband agreed to pay alimony based upon 46.5% of his income, with the husband to receive "a credit against said spousal support obligation in an amount equal to 46.5% of the Wife's gross income from her employment *should she become employed* during the time that the Husband's spousal support obligation is in effect." The agreement was approved by the court. The husband brought a later action to reduce his alimony obligation based on his changed circumstances. Additionally, he argued income should be imputed to the wife. The lower court agreed. The Ohio Court of Appeals reversed, holding the language "should [wife] become employed" was clear, and the lower court had no authority to modify the agreement so as to impute income to the wife absent express authority to do so.

· In the present case, no analogous provision exists. Though capital gains and non-taxable income are excluded from the formula, there is no provision requiring Husband to pay a percentage of his ordinary income as alimony "should he become employed." To the contrary, Husband had a history of stable employment at the time the agreement was reached and approved by the court, an underlying fact undoubtedly serving as the foundation for the support provisions. Consequently, we hold this case is inapposite. Furthermore, as a matter of interpreting the decree, we conclude the family court did not err by imputing income to Husband.

---

8. Rule 2, Ohio Supreme Court Rules for the Reporting of Opinions, provides in part that unofficially published and unpublished opinions of the Courts of Appeals may be cited by any court or person as "persuasive" authority on a court, including the deciding court, in the judicial district in which the opinion was rendered.

 Generally, where an agreement is clear and capable of legal construction, the courts only function is to interpret its lawful meaning and the intent of the parties as found within the agreement. *Bogan v. Bogan,* 298 S.C. 139, 142, 378 S.E.2d 606, 608 (Ct.App.1989). However, where an agreement has been merged into a courts decree, the decree, to the extent possible, should be construed to effect the intent of both the judge and the parties. *McDuffie v. McDuffie,* 308 S.C. 401, 409, 418 S.E.2d 331, 336 (Ct.App.1992); *see also Ratchford v. Ratchford,* 295 S.C. 297, 299, 368 S.E.2d 214, 215 (Ct.App. 1988) (holding a court should not decide an issue relating to an agreement that has been incorporated into a decree as if there were no agreement); *Mattox v. Cassady,* 289 S.C. 57, 60, 344 S.E.2d 620, 622 (Ct.App.1986) ("Like any other agreement, when the language of a settlement agreement is susceptible of more than one interpretation, it is the duty of the court to ascertain the intentions of the parties."); *Elliott v. Elliott,* 274 S.C. 224, 226, 262 S.E.2d 413, 414 (1980) ("[T]he contractual nature of [the parties] agreement was, to some extent, lost when it was incorporated into the . . . Family Court Order.").

 " 'A court approved divorce settlement must be viewed in accordance with principles of equity and there is implied in every such agreement a requirement of reasonableness.' " *Ebert v. Ebert,* 320 S.C. 331, 340, 465 S.E.2d 121, 126 (Ct.App.1995) (quoting 17A Am.Jur.2d *Contracts* § 479 (1991)). "In the absence of an express provision in the contract, the law will imply an agreement to do those things that according to reason and justice should be done to carry out the purpose for which the contract was made." *Columbia East Assocs. v. Bi–Lo, Inc.,* 299 S.C. 515, 520–521, 386 S.E.2d 259, 262 (Ct.App.1989).

Though the terms of the decree grant Husband great latitude in his choice of employment and provide a standard measure for reporting income, Husband's right to manipulate his income must be governed by what is reasonable in light of the purposes of the agreement and the decree. There certainly is no fact in the record to support a conclusion that the parties or the court contemplated Husband's current financial circumstances, and any suggestion that the support provisions in the agreement and decree were intended to diminish or extinguish Wife's support if Husband's wealth increased to the

point he no longer needed to work is illogical. Simply stated, such a reading of the provisions undermines the essential purpose of the agreement. Read as a whole, one purpose of the decree was to provide a continuing means of support for Wife that kept pace with Husband's income. Therefore, we hold the family court did not err by ruling income should be imputed to Husband.

## 2. Amount of Imputed Income

 Husband argues the family court imputed an excessive amount of income to him.

 It is well-settled in South Carolina that an award of alimony should be based on the payor spouse's earning potential rather than merely his current, reported earnings. *See* S.C.Code Ann. § 20–3–130(C)(4) & –130(C)(6) (Supp.2002) (requiring the family court to consider "the employment history and earning potential of each spouse" and "the current and reasonably anticipated earnings of both spouses when awarding alimony"). Accordingly, a spouse obligated to pay alimony may not voluntarily or intentionally change his employment or economic circumstances so as to curtail his income and thereby avoid paying alimony or child support. *See Camp v. Camp*, 269 S.C. 173, 174, 236 S.E.2d 814, 815 (1977) (holding that the courts "will closely scrutinize the facts of any case wherein a husband and father voluntarily changes employment so as to lessen his earning capacity and, in turn, his ability to pay alimony and child support monies").

The family court ruled it was unnecessary to determine the exact amount of income to impute to Husband because the combination of his imputed salary and the income from the covenant not to compete would exceed $125,000 per year, the amount triggering the maximum alimony provision in the formula. In reaching this conclusion, the court noted that in 1992, less than $20,000 would need to be imputed, in 1993–1995, no income would need to be imputed, and in more recent years, only approximately $60,000 would need to be imputed.

Contrary to the family court's position, we do find it necessary to determine the amount of income to be imputed to Husband because, prior to this lawsuit, Messer Industries temporarily discontinued Husband's payments under the cove-

nant not to compete. Should the same thing occur in the future, it is necessary to know the amount of income to be imputed in order to properly calculate the alimony payable.

As the family court noted, Husband had an annual salary of $86,000 beginning in 1988 and continuing until 1993. Thereafter, he worked for the company until his position was terminated in 1996. We find no evidence in the record indicating his income earning potential was impaired by age or health. Consequently, we conclude imputing $86,000 per year as salary reflects Husband's earning potential and should be imputed to him as ordinary income for the years following 1996.

Thus, we agree with the family court's conclusion that Husband's ordinary income will trigger the maximum amount of alimony permitted under the formula for every year following 1996, so long as Husband continues to receive income from the covenant not to compete and has not reached retirement age. Furthermore, we agree with the family court's finding that imputation of income for Husband's voluntary underemployment should cease beginning in 2007, the year Husband will reach retirement age.

**D. Did the family court err in its interpretation of the seventy-five percent clause?**

Next, Husband argues the family court erred by misconstruing the seventy-five percent clause contained in the decree.

Generally, where an agreement is clear and capable of legal construction, the courts only function is to interpret its lawful meaning and the intent of the parties as found within the agreement. *Bogan,* 298 S.C. at 142, 378 S.E.2d at 608. However, where an agreement has been merged into a courts decree, the decree, to the extent possible, should be construed to effect the intent of both the judge and the parties. *McDuffie,* 308 S.C. at 409, 418 S.E.2d at 336; *see also Ratchford,* 295 S.C. at 299, 368 S.E.2d at 215 (holding a court should not decide an issue relating to an agreement that has been incorporated into a decree as if there were no agreement); *Mattox,* 289 S.C. at 60, 344 S.E.2d at 622 ("Like any other agreement, when the language of a settlement agreement is susceptible of more than one interpretation, it is the duty of the court to

ascertain the intentions of the parties."); *Elliott,* 274 S.C. at 226, 262 S.E.2d at 414 ("[T]he contractual nature of [the parties] agreement was, to some extent, lost when it was incorporated into the . . . Family Court Order.").

Based on its construction of the alimony formula, the family court ruled that regardless of the amount of Husband's ordinary income, Husband's alimony obligation must at least be $16,000. We conclude this interpretation renders the seventy-five percent clause meaningless.

The alimony provisions set alimony at $1,200 per month until child support ended. Once child support ended, the alimony formula applied, fixing the amount at thirty percent of the first $85,000 of Husband's adjusted gross income, excluding capital gains, and ten percent of his income over $85,000, with a minimum of Sixteen Thousand ($16,000.00) per year and a maximum of Twenty Nine Thousand Five Hundred ($29,500.00) Dollars per year.

The seventy-five percent clause followed these provisions. Premised upon the possibility of future changes in Federal Tax structure, or economic or physical conditions affecting the husband, it states "at no time under the payment schedules set forth above, shall [Husband] pay more than Seventy Five (75%) percent of his annual income after Federal and State Taxes, FICA deductions, and child support payments are deducted."

Based upon the language, we conclude the seventy-five percent clause applies as a limitation under either of the alimony provisions. Therefore, when it is applicable, the seventy-five percent clause overrides the minimum $16,000 alimony provision.

We reach this conclusion for two reasons. First, the seventy-five percent clause states that it applies under "the payment schedules," thus referring to both the payment schedule in effect when child support is paid and the schedule under the alimony formula. Second, the numerator employed in the clause is Husband's "annual income after Federal and State Taxes, FICA deductions, and child support payments are deducted." There would be no reference to the deduction of child support payments if the clause only applied under the alimony formula, because payment under the formula only

commences after child support ceases. Therefore, the Seventy Five (75%) clause provides a limitation on the amount of alimony payable under either schedule, thereby overriding the stated minimum of $16,000, when it applies.

However, by its clear terms, the limitation only applies when the alimony obligation exceeds 75% of Husband's annual income less stated deductions as a result of changes in Federal Tax structure, or economic or physical conditions affecting the husband. We agree with Wife that this provision was intended to provide protection to Husband in the event of adverse consequences from future tax law changes, economic conditions, or physical conditions affecting him that are beyond his control. Reading the clause in light of the entire agreement, we conclude the clause was not intended to allow Husband to limit his alimony obligation by voluntarily lowering his annual income.

Notwithstanding our conclusion the seventy five percent clause can operate as a limitation on alimony under the formula, it does not aid Husband under the present circumstances for the reason above stated. As we have already discussed, income subject to the formula is imputable to him in the amount of $86,000 per year based on his underemployment, and to the extent it is paid, ordinary income is imputable for the amounts paid under the covenant not to compete. These figures provide a combined ordinary income exceeding $125,000, the amount triggering the $29,500 maximum alimony.

### E. Did the family court err by awarding Wife attorneys' fees?

■■ Husband argues the family court erred by awarding Wife attorneys fees. Specifically, Husband contends the family court did not substantiate its award by requiring the production of detailed time sheets and other documentation. This argument is without merit.

■■ The family court is authorized by statute to award attorneys fees in conjunction with marital litigation. . *See* S.C.Code Ann. § 20–7–420(2) (Supp.2002). In determining the amount of attorneys fees to award, the court should consider the nature, extent, and difficulty of the case, the time neces-

sarily devoted to the case, counsels professional standing, the contingency of compensation, the beneficial results obtained, and the customary legal fees for similar services. *Glasscock v. Glasscock*, 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991).

In this case, the family court analyzed each of the factors outlined above and detailed its findings in its final order. Its findings are further supported by the affidavits of Wife's counsel submitted to the family court and contained in the record before us.

Accordingly, we find no abuse of discretion in the family court's award of attorney's fees to Wife.

## II. Wife's Appeal

**A. Did the family court err by ruling Wife waived her right to additional alimony under the alimony formula accruing prior to 1997?**

■ Wife argues the family court erred by ruling she and Husband orally modified the decree. We agree.

In pertinent part, the decree provided that once the children were emancipated, Husband's alimony obligation was subject to a calculus. Furthermore, the decree provided, "no modification nor waiver of any of the terms hereof shall be valid unless in writing and signed by both parties."

According to the unappealed finding of the family court, by November of 1991, both children were emancipated. The evidence indicates that subsequently, Wife demanded Husband begin paying alimony as calculated under the alimony formula. However, Husband refused, and Wife orally agreed to allow Husband to pay less than the decree required. Thereafter, in 1997, Husband discontinued paying alimony altogether, and Wife brought this suit.

Based on this evidence, the family court ruled Wife's oral consent to an alteration of the alimony agreement was sufficient to modify the provisions of the alimony formula. Consequently, the family court held Wife waived her right to the alimony payments required by the formula for the period prior to 1997.

Although we agree that generally a written contract may be orally modified, notwithstanding a provision in the contract

barring oral modification,[9] where, as here, a contract has been merged into a court order, and the order contains a provision barring oral modification, any oral modification is unenforceable. *See Miles v. Miles*, 355 S.C. 511, 519, 586 S.E.2d 136, 140 (Ct.App.2003) ("[I]t is axiomatic that parties cannot modify a court order."). Therefore, we hold the family court erred by ruling the decree was orally modified. Thus, we remand this matter to the family court for a determination of the amount of past due alimony owed to Wife.[10]

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the family court's determination that income should be imputed to the Husband both for his underemployment and for his allocation of payments received under the covenant not to compete as capital gain. Additionally, we **AFFIRM** the award of attorneys' fees to Wife.

We **REVERSE** the order of the family court, imputing income to the Husband based on bad faith in the management of his new corporation and interpreting the seventy-five percent clause to apply only to the stated maximum amount of alimony payable under the alimony formula. Furthermore, we **REVERSE** the family court's determination that Wife, by oral modification, waived her right to additional alimony accruing prior to 1997.

Lastly, we **REMAND** to the family court to hold a hearing, and to take such additional testimony as may be necessary, to determine the past and future alimony payments due from Husband to Wife in accordance with the order of the family court as modified by this opinion.

HEARN, C.J., and KITTREDGE, J., concur.

---

9. *See Sanchez v. Tilley*, 285 S.C. 449, 452, 330 S.E.2d 319, 320 (Ct.App. 1985).

10. At trial, Husband argued, as additional equitable defenses, Wife's claim for additional alimony prior to 1997 was barred by both laches and estoppel. Disposing of these claims, the family court ruled neither of the doctrines applied to the facts of this case. Husband has not appealed that ruling. Thus, it is law of the case.