636 S.E.2d 3

**Claire Elizabeth Mouton LaFRANCE, Respondent/Appellant,**

v.

**Michael Leo LaFRANCE, Appellant/Respondent.**

No. 4158.

Court of Appeals of South Carolina.

Heard Sept. 12, 2006.

Decided Oct. 2, 2006.

626

628

J. Falkner Wilkes, of Greenville, for Appellant/Respondent.

Timothy E. Madden, of Greenville, for Respondent/Appellant.

ANDERSON, J.

In this domestic action, Michael Leo LaFrance ("Husband") appeals the family court's imputation of income, division of marital assets, calculation of child support, and award of attorney's fees. Claire Elizabeth Mouton LaFrance ("Wife") cross appeals the family court's awarding Husband a share in the future profits from the sale of the marital home, classifying Wife's jewelry as marital property, and issuing the Supplemental Order dated September 29, 2004 that required each party to share guardian ad litem fees. We affirm in part, reverse in part, and remand.

## FACTUAL/PROCEDURAL BACKGROUND

Husband and Wife married in 1989 and had three children, who at the time of the final hearing were eight, five and four years old. During their fourteen-year marriage the parties relocated a number of times to pursue Husband's professional opportunities and to improve the parties' financial position.

In Lafayette, Louisiana, where the parties married, both worked for Comtel, a telecommunications company. Wife was employed as a sales representative and Husband was a senior executive. Her salary at the time was approximately $45,000.00 and Husband's was approximately $75,000.00.

Comtel merged in 1990 with a long distance telecommunications company, and the couple relocated to Jackson, Mississippi. Husband's salary at that time was approximately $80,000.00, plus stock options. Wife completed her college education during that time and, in addition, worked in a local boutique.

Early in the 1990s Husband started a wireless paging company in Covington, Louisiana. He earned approximately $40,000 per year in this two-year venture. Wife started a bridal registry business, which, though allegedly successful, did not result in any personal income because she put all profits back into the business.

In 1993 or 1994, the couple relocated to Rochester, New York, where Husband accepted an executive level management position with ACC Communications at an initial salary of approximately $150,000.00, plus stock options. Wife returned

to work for a short time until the parties decided to buy a home and start a family. Both agreed Wife would not work outside the home.

In 1997 Husband left ACC, having acquired approximately four million dollars in assets generated by his stocks and options. The family moved to Greenville, South Carolina, where Husband entered a start-up telecommunications venture, "New South," and assumed the position of Chief Executive Officer (CEO). His initial annual salary was $70,000.00, plus stock options. When Husband was terminated from New South in 2001, his annual salary was $150,000.00, plus bonuses and stock options.

At the time of the final hearing in March of 2004, both parties resided in Greenville, South Carolina. Wife was thirty-eight years old and Husband was forty-three. Both graduated from college. Wife takes prescription medication for anxiety but claimed to be in good health otherwise. Husband has severe back problems, has had surgery, and continues to suffer chronic pain. Associated with Husband's back injury is a history of addiction to pain medication, for which he has received some rehabilitative treatment. Husband has not been employed since his termination from New South. Wife began working in the spring of 2003 as a Physician's Liaison with the Greenville Hospital System, earning approximately $75,000.00 annually.

On February 25, 2002, Wife petitioned for divorce on the ground of continuously living separate and apart for one year without intervening cohabitation. Subsequently, Husband and Wife agreed upon custody, visitation, family support, and division of certain marital assets.[1]

---

1. Husband left New South with a severance package which included, in addition to other benefits, a gross income of $500,000.00 to be paid over an eighteen-month period. Parties initially agreed to use the after tax income from New South, which amounted to approximately $15,000.00 monthly, to pay the $3365.18 monthly mortgage payment on the marital home and to pay non-taxable family support to Wife in the amount of $7,500.00 per month. Husband received the balance for his use. The agreement was formalized by Temporary Order of Judge Amy C. Sutherland, dated April 10, 2002. At that time, only six months of income remained to be disbursed from the New South severance package. Consequently, the provisions of the order allowed for additional temporary relief when the New South income ended. Subse-

The parties had significant marital property, which, in addition to the marital home, included cash, checking accounts, retirement assets, investment accounts and securities, insurance policies and proceeds, potential income tax refunds and substantial personal property in the form of antiques, home furnishings, vehicles, firearms, coin collections, children's portraits, jewelry, and gold coins.

At the commencement of trial Wife withdrew her requests 1) for permanent alimony; and 2) that Husband maintain a life insurance policy as an incident of support. Instead, Wife sought equitable apportionment of the policy as one of the marital assets. The issues before the court for disposition on final hearing included: divorce; identification, valuation and apportionment of marital assets and marital debts; child support; modification of prior support orders; and attorney's fees.

The family court awarded Wife a divorce on the ground of one year's continuous separation without intervening cohabitation. The parties stipulated that Wife maintain custody of the three minor children, allowing Husband reasonable visitation. The litigants agreed to the permanent apportionment of New South interests in percentages consistent with the apportionment of the general marital estate. Stipulations of the parties were adopted, incorporated into and merged with the final decree and order. The family court identified, valued and equitably apportioned the parties' marital property and debts. The final order provided:

· Among the marital assets is the marital home.... [T]he greater and more credible evidence supports a fair market valuation of $700,000.00.... The marital home is subject to mortgage indebtedness which has a date of filing balance due of $404,000.00.... [A]fter considering this indebtedness, the net fair market value of the equity in this home is $296,000.00.

· [I]n the event the marital home is sold within six years of this Order, and the sales price exceeds $700,000.00, any

---

quent orders dated September 10, 2002, May 16, 2003, and September 10, 2003, modified the original support agreement, eventually relieving Husband of spousal support and reducing his obligation under the marital home mortgage to one-half.

excess net proceeds (resulting from a sales price over $700,000.00) shall be distributed equally to the parties, provided, that any increase in the value of the house that is the direct result of Wife's direct contribution or improvement to the house subsequent to this Order shall not be subject to distribution. This Court reserves jurisdiction to determine the extent of direct contributions in the event that the marital home sells within the six-year period.

· Without question or contest, Husband made the vast majority of the direct contributions to the marriage. . . . Wife clearly made the vast majority of the indirect contributions to the marriage. . . . When considered in their entirety, the contributions of each party to the marriage, both direct and indirect combined, are equal in value.

· Husband is either not employed or significantly underemployed.

· Based on all the credible evidence, Husband has the ability to earn in the lower range of the senior level salaries, or about $100,000.00 per year. Husband is therefore imputed with this level of gross income for purposes of this Order.

· Based on the findings of this Order, and all the credible evidence presented, Husband's gross monthly income for purposes of calculating child support is $8330.00. Wife's gross monthly income for child support purposes is $6250.00. Beginning with the first day of the first month following the filing of this Order, Husband shall pay child support directly to Wife in the amount of One Thousand Nine Hundred Thirty and 00/100 Dollars ($1930.00) per month.

· As an incident of child support, for so long as the children are enrolled in private school, Husband shall pay to Wife, on a monthly basis, 57% of the children's private school tuition.

· Husband shall contribute the sum of Fifty Thousand and 00/100 Dollars ($50,000.00) to Wife's attorney's fees and suit costs.

· Based on careful review of all the evidence, and consideration of all appropriate factors, the marital estate should generally be equally divided between the parties. . . . To effectuate an equal division of the marital estate, Wife shall

pay Husband $48,925.00 ... offset by the $50,000.00 contribution required by Husband to pay Wife's attorney's fees ... with this offset Wife's obligation to pay Husband is satisfied and Husband owes Wife $1075.00....

· It does not appear that any of the nine listed pieces of jewelry was identified as being non-marital.... Based on the evidence presented, the marital jewelry has a fair market value of $46,400.00.

Both parties filed motions to alter or amend the family court's judgment, pursuant to Rule 59(e), SCRCP. Husband filed a motion to dismiss Wife's motion as not timely filed. The family court found Wife's motion was timely filed. Wife objected to Husband's motion to alter or amend on ground that Husband failed to properly serve the motion. The court ruled on both parties' motions and held:

· [T]he jewelry, as declared in the Final Order and Divorce Decree was appropriately declared marital property.

· The findings and conclusions regarding the marital home should not be altered or amended.

· In addition to the obligation to contribute to Plaintiff's attorney's fees and general litigation costs, Defendant shall contribute the sum Five Thousand Five Hundred Thirty–Two and 50/100 Dollars ($5532.50) to the expert fees incurred by Plaintiff. Therefore, Defendant's total contribution to Plaintiff's attorney's fees and costs is and shall be the sum of Fifty–Five Thousand Five Hundred Thirty-two and 50/100 ($55,532.50).... This obligation shall be satisfied by Wife offsetting this contribution for the balance due to Husband for the equitable apportionment of marital property.

· With the evidence before me ... there is no need to alter or amend the findings regarding Defendant's earning capacity as determined in the Final Order and Divorce Decree.

By Supplemental Order dated September 29, 2004, the family court awarded guardian ad litem fees in the amount of $3,617.00, and ordered that each party share equally in paying the obligation, less any monies already paid in satisfaction of this obligation.

### STANDARD OF REVIEW

In appeals from the family court, this court may find facts in accordance with its own view of the preponderance of the evidence. *Nasser–Moghaddassi v. Moghaddassi*, 364 S.C. 182, 189, 612 S.E.2d 707, 711 (Ct.App.2005) (citing *Emery v. Smith*, 361 S.C. 207, 213, 603 S.E.2d 598, 601 (Ct.App.2004)). However, this broad review does not require us to disregard the family court's findings. *Bowers v. Bowers*, 349 S.C. 85, 91, 561 S.E.2d 610, 613 (Ct.App.2002); *Badeaux v. Davis*, 337 S.C. 195, 202, 522 S.E.2d 835, 838 (Ct.App.1999). Nor must we ignore the fact that the trial judge, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Scott v. Scott*, 354 S.C. 118, 124, 579 S.E.2d 620, 623 (2003) (citing *Woodall v. Woodall*, 322 S.C. 7, 10, 471 S.E.2d 154, 157 (1996)).

### LAW/ANALYSIS

Initially, we dispose of a procedural issue challenging this court's jurisdiction to consider Husband's appeal in this matter. Wife maintains the time for filing Husband's notice of intent to appeal lapsed because the time was not tolled by Husband's motion to alter or amend. Husband served his motion by facsimile, which Wife argues is not proper service in accordance with Rule 5(b)(1), SCRCP. We agree with the family court judge that, though Husband technically failed to properly serve his motion, "to refuse to address this motion based on this technical defect would not do substantial justice in this action." "[T]he overriding purpose of service is notice" and Wife unquestionably had notice of Husband's motion.

### HUSBAND'S APPEAL

**I. Imputed Income**

Husband contends the family court erred in imputing income to him. Specifically, Husband argues the record failed to demonstrate Husband's continued unemployment was voluntary because: 1) Wife did not establish that employment was available at the level of income imputed by the court; 2) Husband suffered both physical and mental limitations due to severe injury; and 3) the family court considered available out

of state employment that would alienate Husband from his minor children.

The family court judge declared that "[w]hen one or more parties is unemployed or underemployed and issues of equitable distribution, child support and attorney's fees are presented, the family court judge must determine the party's reasonably anticipated income and earning potential." Consistent with that determination the court will impute income to the unemployed or underemployed party for purposes of calculating support obligations. *See* S.C.Code Ann. Regs. 114–4720 (Supp.2005). The statutes addressing domestic matters in South Carolina mandate that the family court consider certain factors in dividing marital property and awarding spousal and child support. Section 20–7–472 of the South Carolina Code requires that, in making an equitable division of marital assets and debts, the family court give weight in such proportion as it finds appropriate to fifteen enumerated factors. Those particularly relevant for imputation of income include:

3) the value of the marital property, whether the property be within or without the State. The contribution of each spouse to the acquisition, preservation, depreciation, or appreciation in value of the marital property, including the contribution of the spouse as homemaker; provided, that the court shall consider the quality of the contribution as well as its factual existence;

(4) the income of each spouse, the earning potential of each spouse, and the opportunity for future acquisition of capital assets;

(5) the health, both physical and emotional, of each spouse;
. . .

(15) such other relevant factors as the trial court shall expressly enumerate in its order.

S.C.Code Ann. § 20–7–472 (Supp.2005).

In awarding spousal support, the family court must consider thirteen factors. Those pertaining to the question of imputing income include:

(2) the physical and emotional condition of each spouse . . .

(4) the employment history and earning potential of each spouse . . .

(6) the current and reasonably anticipated earnings of both spouses;

(7) the current and reasonably anticipated expenses and needs of both spouses....

S.C.Code Ann. § 20–3–130(C) (Supp.2005).

For calculation of child support under guidelines promulgated pursuant to section 43–5–580(b) of the South Carolina Code, income is defined as "actual gross income of the parent, if employed to full capacity, or potential income if unemployed or underemployed." 27 S.C.Code Ann. Regs. 114–4720(A)(1) (Supp.2005). Regarding the imputation of income, the guidelines provide:

If the court finds that a parent is voluntarily unemployed or underemployed, it should calculate child support based on a determination of potential income which would otherwise ordinarily be available to the parent....

(b) In order to impute income to a parent who is unemployed or underemployed, the court should determine the employment potential and probable earnings level of the parent based on that parent's recent work history, occupational qualifications, and *prevailing job opportunities and earning levels in the community.*

27 S.C.Code Ann. Regs. 114–4720(A)(5)(B) (Supp.2005) (emphasis added).

Given the general principles of imputation of income in family court litigation, we are instructed by our case law involving child support. South Carolina courts have not hesitated to impute income in child support cases where a parent is voluntarily unemployed or underemployed. In 1986, before the legislature mandated adherence to the child support guidelines, we held that a father's earning potential was properly considered in calculating his child support obligation where he voluntarily removed himself from the job market to attend law school. *Chastain v. Chastain,* 289 S.C. 281, 283, 346 S.E.2d 33, 35 (Ct.App.1986). Subsequently, in *Eckstein v. Eckstein,* 306 S.C. 167, 169–70, 410 S.E.2d 578, 580 (Ct.App.1991), this court concluded the family court properly considered the wife's potential income in calculation of her child support obligation, though she had custody of two young children and was responsible for their care. We noted the record reflected

the family court's appropriate inclusion of child care costs in its determination. *Id.* at 170, 410 S.E.2d at 580; *see also, Patel v. Patel,* 359 S.C. 515, 532, 599 S.E.2d 114, 123 (2004) (affirming family court's properly imputing minimum wage income to voluntarily unemployed or underemployed wife, though she had custody of two children, but was capable and energetic). In *Holcombe v. Hardee,* our Supreme Court reversed the family court's refusal to require child support from the wife who claimed she was unable to pay that obligation. 304 S.C. 522, 523, 405 S.E.2d 821, 822 (1991). The Court found the wife had potential income, investments, and many assets from which she could contribute to her child's support. *Id.* at 525, 405 S.E.2d at 822–23. Citing *Miller v. Miller,* 299 S.C. 307, 312, 384 S.E.2d 715, 716 (1989), the Court listed the following factors to be considered in determining child support obligations: both parents 1) incomes; 2) ability to pay; 3) education; 4) expenses; 5) assets; and the 6) the facts and circumstances surrounding each case. *Id.*

In *Robinson v. Tyson,* 319 S.C. 360, 361, 461 S.E.2d 397, 398 (Ct.App.1995), the family court awarded an increase in child support based on income imputed to the husband after finding him voluntarily underemployed. The family court imputed an annual income of $30,000.00 even though the husband claimed his income as an attorney was $700.00 per month. Evidence of voluntary underemployment included testimony that recent hires in the community started at yearly salaries of $35,000.00. *Id.* at 362, 461 S.E.2d at 398. Additionally, the University of South Carolina School of Law placement office reported the lowest starting salary for new attorneys in the community was $25,000.00 annually. *Id.* Eleven years prior to the court hearing and before attending law school, the husband had earned $17,000.00 annually. *Id.* Further, he made no efforts to find more lucrative employment, his present wife was unemployed, and he frequently borrowed money from his father. *Id.* This court, "[b]ased on the evidence of the father's occupational qualifications, prevailing job opportunities, earning levels in the community, and his insincere efforts to provide the trial court with evidence of his earning potential, [affirmed] the family court's finding that the father [was] voluntarily underemployed." *Id.* at 363, 461 S.E.2d at 399. Similarly, in *Fisher v. Fisher,* 319 S.C. 500, 506, 462 S.E.2d

303, 306 (Ct.App.1995), we affirmed the family court's imputing $8.00 per hour income to the husband for purposes of calculating child support, although he was unemployed at the time of the hearing. Evidence in the record showed that the husband had been employed at $8.00 per hour for about eighty days, but voluntarily left that position because "it was too far away, too dirty" and unrelated to work he previously performed. *Id.* at 507, 462 S.E.2d at 307.

As in *Chastain*, 289 S.C. at 283, 346 S.E.2d at 35, we found no error in the family court's imputing income to the wife for child support purposes in *Engle v. Engle*, 343 S.C. 444, 450, 539 S.E.2d 712, 714 (Ct.App.2000). The wife had a master's degree and had been employed as a department coordinator at Furman University earning $28,000.00 per year when she voluntarily chose to relocate to pursue graduate studies. The family court imputed $28,000.00 per year, reasoning she would have earned at least that much had she not voluntarily terminated her employment at Furman. *Id.*

In *Mazzone v. Miles*, 341 S.C. 203, 209, 532 S.E.2d 890, 893 (Ct.App.2000), we affirmed the family court's imputation of income over the wife's objection that the imputed amount was less than the husband's earning potential. In *Mazzone*, the husband had voluntarily provided some financial support for the child before the commencement of the family court action. *Id.* at 206, 532 S.E.2d at 892. When husband was terminated from his five-year employment where his income was $12.50 per hour, he started a tractor trailer repair business, which had been in operation for less than one year. The business was operating at a loss at the time of trial. *Id.* at 207, 532 S.E.2d at 892. The family court imputed minimum wage to the husband in calculating child support. Wife argued husband's employment potential was considerably greater. *Id.* at 208, 532 S.E.2d at 892. The family court found no evidence indicating the termination from his job was the result of any wrongdoing and no evidence the decision to start his own business was motivated by a desire to avoid support obligations. Husband testified he was fired for refusing to participate in fraudulent activity and few available jobs existed that were similar to his former employment. He further admitted that the expenses in his new business were greater than anticipated. *Id.* at 208–9, 532 S.E.2d at 893. We concluded

the evidence reflected the husband's good faith effort to pursue self-employment. "The fact that the newly-formed business ha[d] not yet shown a profit does not constitute a showing the father's efforts at making the business a success [were] less than sincere." *Id.*

*Messer v. Messer* was a spousal support case in which the husband declared income he received from a covenant not to compete as capital gains, thus lowering his income and avoiding payment of alimony. 359 S.C. 614, 619, 598 S.E.2d 310, 313 (Ct.App.2004). The family court found the covenant not to compete was ordinary income and imputed income to the husband, despite the fact he did not work. *Id.* at 626, 598 S.E.2d at 317. We held:

> [t]hough the terms of the decree grant Husband great latitude in his choice of employment and provide a standard measure for reporting income, Husband's right to manipulate his income must be governed by what is reasonable in light of the purpose of the agreement and the decree.... Read as a whole, one purpose of the decree was to provide a continuing means of support for Wife that kept pace with Husband's income. Therefore, we hold the family court did not err by ruling income should be imputed to Husband.

*Id.* at 628, 598 S.E.2d at 318.

Finding no evidence of earning potential impaired by age or health, the court of appeals imputed an annual salary to the husband in the amount of $86,000.00, based on his annual salary from 1988 though 1993. *Id.* at 630, 598 S.E.2d at 319. It is important to note we reversed the family court's finding that husband's minimizing his ordinary income and, consequently, his alimony obligation, violated the covenant of good faith and fair dealing. We agreed with the husband that he had not acted in bad faith by attempting to minimize his tax consequences, though it had the effect of decreasing the wife's support. *Id.* at 622, 598 S.E.2d at 315.

Contrastively, in *Patrick v. Britt*, we agreed with the family court in its finding that the husband "purposefully arranged his finances in a manner that would make it difficult to determine his actual income." 364 S.C. 508, 511, 613 S.E.2d 541, 542 (Ct.App.2005). Husband was the owner and operator of a business that reported over $430,000.00 in income in 2002.

Yet, he reported only $66.01 per month in income on his financial declaration, attributing his low income to high costs of running the business. *Id.* at 510, 613 S.E.2d at 542. The family court imputed income of $100,000.00 and we affirmed, based on the accountant's evidence, the applicable law and Britt's refusal to assist the court in resolving the issue. *Id.* at 513, 613 S.E.2d at 543 (citing *Robinson v. Tyson,* 319 S.C. 360, 364, 461 S.E.2d 397, 399 (Ct.App.1995)).

Likewise, in *Penny v. Green,* we affirmed the family court's imputation of $120,000.00 to the husband, rather than the $100,000.00 income he claimed. 357 S.C. 583, 590, 594 S.E.2d 171, 175 (Ct.App.2004). The family court correctly determined the husband relocated voluntarily, and his purported $100,000.00 salary was based on a three day work week. Therefore, the family court imputed $120,000.00 in income based on the husband's previous earnings. *Id.* at 591, 594 S.E.2d at 175. This court explained "[w]here a parent voluntarily lessens his or her earning capacity, this court will closely scrutinize the facts to determine the parent's capacity to earn, rather than his or her actual earnings." *Id.* (citing *Robinson v. Tyson,* 319 S.C. at 363, 461 S.E.2d at 399). Additionally, we reversed the family court's reduction in husband's support obligation. 357 S.C. at 590, 594 S.E.2d at 174. Husband maintained his income decrease after his move was a substantial change in circumstances, warranting modification, because, during the pendency of the divorce proceedings, he underreported his income in his original financial declaration. Thus, the disparity between his true income and current income was substantial. We concluded the family court erred in allowing the husband to contradict his previous financial declaration in order to demonstrate a larger disparity from his present income. *Id.* at 591, 594 S.E.2d at 175. "A party cannot misrepresent income and expenses on a financial declaration for purposes of having an agreement approved and then refute the accuracy of that document in a subsequent modification action." *Id.* (citing *Rogers v. Rogers,* 343 S.C. 329, 332, 540 S.E.2d 840, 841 (2001)).

Most recently, we reversed the family court's imputation of the husband's income at over $9000.00 per month where there was no evidence in the record that his income was voluntarily depressed. *Arnal v. Arnal,* 363 S.C. 268, 281, 609 S.E.2d 821,

828 (Ct.App.2005) *cert. granted,* March 23, 2006. Though the husband was well educated and could earn additional income, the amount of imputed income was not warranted without evidence that his "failure to make additional income was due to any wrongdoing on his part or motivated by a desire to decrease his support obligation." *Id.* (citing *Mazzone v. Miles,* 341 S.C. 203, 209, 532 S.E.2d 890, 893 (Ct.App.2000)). We opined that taking wife's contention that the husband was capable of earning more income to its logical conclusion, a family court could conceivably impute income to a spouse by merely finding he or she was capable of earning more income. "This is simply not the test for imputation of income in this state." *Id.* at 282, 609 S.E.2d at 828.

The principles distilled from *Mazzone* and *Arnal* suggest that voluntariness, for the purposes of imputing income, encompasses unemployment or underemployment that is not only intentional, but is additionally the result of some wrongdoing or effort to avoid a support obligation. Our neighboring jurisdictions are guided by similar principles. In North Carolina, "[t]he determination of whether to impute income to a parent who is voluntarily unemployed is a determination based in part on the conduct of the parent." *Roberts v. McAllister,* 621 S.E.2d 191, 198 (N.C.Ct.App.2005) (citing *Wolf v. Wolf,* 151 N.C.App. 523, 566 S.E.2d 516 (2002)). The "earning capacity rule" is the basis for imputation of income articulated in the North Carolina Child Support Guidelines:

> If either parent is voluntarily unemployed or underemployed to the extent that the parent cannot provide a minimum level of support for himself or herself and his or her children when he or she is physically and mentally capable of doing go, and the court finds that the parent's voluntary unemployment or underemployment is the result of a parent's bad faith or deliberate suppression of income to avoid or minimize his or her child support obligation, child support may be calculated based on the parent's potential, rather than actual income. Potential income may not be imputed to a parent who is physically or mentally incapacitated or is caring for a child who is under the age of three years and or whom support is being determined.

Child Support Guidelines, 2003 Ann. R. (N.C.) 33, 35 (2003) (cited in *Cook v. Cook,* 159 N.C.App. 657, 583 S.E.2d 696, 698 (2003)).

Before earning capacity may be used as the basis of an award, there must be a showing that the actions which reduced the party's income were taken in bad faith, to avoid family responsibilities. *Pataky v. Pataky,* 160 N.C.App. 289, 585 S.E.2d 404, 415 (2003) (citing *Bowers v. Bowers,* 141 N.C.App. 729, 541 S.E.2d 508 (2001)); *Sharpe v. Nobles,* 127 N.C.App. 705, 493 S.E.2d 288 (1997).

In Florida,

[i]ncome on a monthly basis shall be imputed to an unemployed or underemployed parent when such employment or underemployment is found to be voluntary on that parent's part, absent physical or mental incapacity or other circumstances over which the parent has no control. In the event of such voluntary unemployment or underemployment, the employment potential and probable earnings level of the parent shall be determined based upon his or her recent work history, occupational qualifications, and prevailing earnings level in the community; however, the court may refuse to impute income to a primary residential parent if the court finds it necessary for the parent to stay home with the child.

Fla. Stat. § 61.30(2)(b) (2005).

Florida's standard for imputing income requires the family court to set forth specific findings on earning potential, source of income imputed and actual income. *See Alich v. Clapp,* 926 So.2d 467, 468 (Fla.Dist.Ct.App.2006) (holding the family court erred in imputing income where no evidence supported finding). The family court may only impute a level of income supported by the evidence of employment potential and probable earnings based on history, qualifications, and prevailing wages. *Id.; see Edel v. Walker,* 927 So.2d 989, 990 (Fla.Dist. Ct.App.2006) (finding record was sufficient to support family court findings of imputed income); *Morin v. Morin,* 923 So.2d 582, 584 (Fla.Dist.Ct.App.2006) (concluding family court erred in imputing income at level greater than level ever earned during the marriage).

Virginia adheres to similar evidentiary requirements. In *Mir v. Mir,* 39 Va.App. 119, 571 S.E.2d 299, 301 (2002), the court held evidence was insufficient to support finding the former husband was voluntarily unemployed or to impute $5600.00 monthly income for purposes of child support. Nothing in the record suggested the husband ever made monthly income in the imputed amount or demonstrated jobs were available that would generate such an income. *Id.* at 303. Additionally, evidence indicated the husband had health problems preventing him from working longer hours or doing other jobs. *Id.* The court concluded the manner of imputation and the amount were inconsistent with the evidence in the record and remanded to the family court for further consideration. *Id.* at 304.

In *Hatloy v. Hatloy,* 41 Va.App. 667, 588 S.E.2d 389, 390 (2003), the court held the evidentiary burden was satisfied that former husband's inability to pay his support obligation was not due to his own voluntary act. Husband had previously worked for AOL, earning $55,070.00 yearly but was terminated through no fault of his own. *Id.* Though the husband sought employment with other high tech industries, he testified that no jobs were available to him at his level of education. *Id.* Consequently, he returned to work in the hospitality industry, earning a salary based on profits of a seasonal recreational resort. *Id.* The venture lost money during the first year, but the husband anticipated drawing a salary of $1000.00 per month in the near future. *Id.* at 391. The appellate court affirmed the family court's imputation of $1600.00 per month income rather than the amount previously earned from AOL. *Id.* at 392.

The Virginia Court of Appeals refused to impute income to a former wife in determining the parents' child support obligations. In *Budnick v. Budnick,* 42 Va.App. 823, 595 S.E.2d 50, 59 (2004), the husband argued wife's refusal to accept a job transfer to a different geographical area constituted voluntary unemployment and the resulting loss of income should be imputed to her at the salary she would have earned. When wife's position was terminated and she was asked to relocate, the parties' daughter was a senior in high school and their son was enrolled in special education classes. The court found, "no authority for a *per se* rule which would hold that a

supporting spouse always becomes voluntarily underemployed or unemployed when he or she refuses to accept an offer of comparable employment in another geographical location." *Id.* (quoting *Reece v. Reece,* 22 Va.App. 368, 470 S.E.2d 148, 151 (1996)). Moreover, "whether failure to relocate constitutes voluntary unemployment or underemployment, sufficient to justify imputing income is a matter for a trial court to determine on the particular facts of the case before it." *Id.*

Virginia's child support guidelines, like North Carolina's, specifically articulate a good faith basis for determining the voluntariness of unemployment or underemployment. The statute reads, in pertinent part: "[A]ny consideration of imputed income based on a change in a party's employment shall be evaluated with consideration of the good faith and reasonableness of employment decisions made by the party...." Va.Code. Ann. § 20–108.1 (2006).

Under South Carolina law, where an obligor voluntarily lessens his or her earning capacity, this court will closely scrutinize the facts to determine earning potential, rather than actual income. *Camp v. Camp,* 269 S.C. 173, 174, 236 S.E.2d 814, 815 (1977); *Robinson v. Tyson,* 319 S.C. 360, 363, 461 S.E.2d 397, 399 (Ct.App.1995). However, the failure to reach full earning capacity, by itself, does not automatically equate to voluntary underemployment such that income must be imputed. *Kelley v. Kelley,* 324 S.C. 481, 488–89, 477 S.E.2d 727, 729 (Ct.App.1996). Instead, when actual income versus earning capacity is at issue, the court should closely examine the payor's good faith and reasonable explanation for the decreased income. *Arnal,* 363 S.C. 268, 281, 609 S.E.2d 821, 828, (Ct.App.2005), *cert. granted,* March 23, 2006. Furthermore, lack of evidence indicating unemployment or underemployment resulted from any wrongdoing or was motivated by desire to avoid support obligations is at least persuasive the unemployment or underemployment is less than voluntary. *Mazzone,* 341 S.C. at 209, 532 S.E.2d at 893. That Husband had at times earned incomes in the range of $100,000.00–$200,000.00 does not warrant the imputation of income in that range without evidence showing his "failure to make additional income was due to any wrongdoing on his part or motivated by a desire to decrease his support obligation." *Arnal,* 363 S.C. at 281, 609 S.E.2d at 828 (citing *Mazzone,* 341 S.C. at 209,

532 S.E.2d at 893). Wife presented no evidence that any jobs for which Husband is qualified exist or are available in the community. Availability of employment in the community commensurate with the party's education and occupational history is, likewise, relevant to the inquiry of voluntariness. *See* 27 S.C.Code Ann. Regs. 114–4720; *Robinson,* 319 S.C. at 362, 461 S.E.2d at 398. Finally, Husband's poor health, combined with the fact he is making some efforts to either secure employment or establish a business persuade us that his continued unemployment or underemployment is not entirely voluntary. Earning potential, impaired by age or health, is relevant for imputing income. *See Messer v. Messer,* 359 S.C. 614, 630, 598 S.E.2d 310, 319 (Ct.App.2004).

In the case *sub judice,* the family court judge determined that Husband was "either not employed or significantly underemployed," and imputed $100,000 in income to Husband. The judge's order indicates he based the imputed income amount on evidence he found credible. Wife's expert witness, Ron Morgan, a telecommunications recruiter, testified as to available jobs in the telecommunications industry which offered salaries in the range of $100,000.00–$200,000.00. Morgan explained his conclusions about potential jobs were derived from computer generated print outs from his recruiting company's database and an outside database. In addition, he reviewed Husband's New South "bio." However, few, if any of the positions Morgan identified presented opportunities at the senior executive level. Moreover, the positions Morgan observed were located in Tennessee, California, Minnesota, New Jersey, Texas, Colorado, Washington, and Arkansas, all of which would require Husband's relocation outside the community in which he currently lives and away from his three minor children. Morgan's testimony confirmed the telecommunications industry was depressed at the time of filing, and the climate for job opportunities in the industry in 2001 and 2002 was "flat." Morgan opined it would take someone "looking eight to ten hours per day, everyday, full time" to find reemployment in telecommunications.

Husband stated he was seeking employment in the film industry. He believed looking to the telecommunications industry for employment would be futile. He maintained the only position available to him would be a sales or technician

position at a salary of $50,000.00, and that if he took such a position his prospects for returning to senior executive position in telecommunications would be "over." Husband declared he contacted all of the companies listed in Morgan's client database. He did not contact local independent telephone companies to inquire about positions because he had no experience in that particular area. Nor did Husband seek employment with other telecommunications entities in South Carolina that were former competitors because he surmised they would not consider hiring him. Additionally, he turned down a job as a CEO of a school renovation project. Husband testified he could obtain a job earning $50,000.00 annually and added he was involved in establishing a new company.

Even if senior executive positions were determined to be available in the Greenville area, evidence suggests Husband's poor health would prevent him from working at the level of intensity his previous occupation required. Before his termination from New South in 2001, Husband was working fourteen to sixteen-hour days, seven days a week. The family court judge observed at trial that Husband's behavior was not consistent with a senior executive's behavior, noting Husband was habitually late and appeared "lethargic, either from pain or medication." The judge indicated "Husband walked with the assistance of a cane and outwardly exhibited pain."

Husband had severe back problems from an injury in 1985. A flare up in 1999 resulted in Husband's regular use of pain medication and his eventual addiction to oxycontin. Though Husband denied addiction and referred to his dependency as habituation, his medication use, nevertheless, interfered with his work and apparently led to his termination from New South in January of 2001. Husband had back surgery in May of 2001 but continued to experience problems associated with medication. Wife stated he attempted rehabilitation in Florida in October of 2001. Under direct examination by her attorney, Wife testified to the following about Husband's health:

Q: You told us about his health, with respect to his back. Otherwise, how has his physical health been, prior to the back problem.

A: It's horrible.

Q; Prior to the back problems?

A: Oh, it is—it was pretty good. I mean, his back would go out, you know once a year, then it was once a month, you know. I mean, it's degenerative disk problem [sic], you know?

Q: Other than, the back problems?

A: You know, he had allergies. And he'd get bad colds, he'd get run down or whatever, but it was good.

. . . .

Q: And how would you describe—other than what you've described, how would you describe your husband's psychological demeanor, prior to this last few years?

A: You know, he's always been a little crazy and different. But he was, you know, kind of normal, off center.

Q: Did he have anything that he took medication for?

A: Yes, he took Klonopin for—well he's taken Klonopin, since Jackson, Mississippi, for anxiety. He's got, I would say, an anxiety disorder.

Q: In this case, we took a deposition of his internist, Dr. Grover? [2]

A: Right.

Q: And we're going to submit that, as part of this record today by stipulation. Dr. Grover generally described him, as not being very healthy?

A: Right. He said, he was in pretty poor health.

Q: Is that consistent, with your current observations?

A: Yes, it is.

Q: And during the course of this litigation, has [Husband] discussed his health with you, on multiple occasions?

A: Yeah, he gives me a pity party, every time I talk to him, about how he's broken a rib, or he's broken a toe, or he's fallen down another flight of stairs. He's very accident prone. He—in fact, I understand he just fell down his attorney's stairs, last week. He's always got something wrong. He said he had pneumonia; he had

---

2. Dr. Grover's deposition was not included in the record.

SARS, one time. He had, you know—he just, he's just got something all the time. He's, a hypochondriac.

Q: Despite all these issues, are you aware of anything that would keep him from working?

A: No.

Concluding from the testimony and observations at trial that the frenzied pace of Husband's efforts to save New South likely exacerbated his physical impairment, increased his reliance on pain medication, and accelerated his overall decline, it is doubtful he could realistically be expected to return to the demanding work environment of a senior executive at this time. In light of the circumstances of the case, the family court judge erred in the amount imputed to Husband. Concomitantly, we reverse the amount of imputation of income and remand for a calculation of imputed income consistent with this opinion. No evidence in the record substantiates that jobs exist in the community, commensurate with Husband's qualifications and experience, warranting the imputed amount. "[T]he court should determine the employment potential and probable earnings level of the parent based on that parent's recent work history, occupational qualifications, and *prevailing job opportunities and earning levels in the community.*" 27 S.C.Code Ann. Regs. 114–4720(A)(5)(b) (Supp. 2005) (emphasis added).

## II. Marital Assets Division

With regard to the division of marital assets, Husband argues the family court erred by (1) assigning equal value to each party's contributions to the marital assets; (2) failing to consider he was forced to invade his property award to provide temporary support for Wife; and (3) awarding Wife the marital home as part of the equitable distribution of marital assets.

Section 20–7–472 of the South Carolina Code requires that "[i]n making apportionment, the court must give weight in such proportion as it finds appropriate" to all of the fifteen enumerated factors. S.C.Code Ann. § 20–7–472 (Supp. 2005). When distributing marital property in a divorce action, the family court should consider all fifteen factors set forth in the applicable statute. *Craig v. Craig,* 365 S.C. 285, 290, 617

S.E.2d 359, 361 (2005). In reviewing the family court's equitable apportionment, an appellate court's role is to examine the fairness of the apportionment as a whole. *Bragg v. Bragg*, 347 S.C. 16, 24, 553 S.E.2d 251, 255 (Ct.App.2001). "This court will affirm the family court judge if it can be determined that the judge addressed the factors under section 20–7–472 sufficiently for us to conclude he was cognizant of the statutory factors." *Jenkins v. Jenkins*, 345 S.C. 88, 100, 545 S.E.2d 531, 537 (Ct.App.2001). The family court has broad discretion in determining how marital property is to be valued and distributed. *Murphy v. Murphy*, 319 S.C. 324, 329, 461 S.E.2d 39, 41 (1995); *Phillips v. Phillips*, 290 S.C. 455, 457, 351 S.E.2d 178, 180 (Ct.App.1986). Therefore, the court may use any reasonable means to divide the property equitably, and its judgment will only be disturbed where abuse of discretion is found. *Murphy*, 319 S.C. at 329, 461 S.E.2d at 41–42; *Barrett v. Barrett*, 290 S.C. 453, 454, 351 S.E.2d 177 (Ct.App.1986).

## A. Contributions to the Marriage

■ Section 20–7–474 of the South Carolina Code provides that, in determining the value of each party's respective contributions, the court:

(1) shall make findings of fact from credible evidence of the values of property and services, if any;

(2) is empowered to take judicial notice of official reports of the federal and state governments, including official bulletins, publications, and reports of general public interest where these reports are made and published by authority of law or have been adopted by state statute;

(3) has the authority to appoint experts as necessary for the purpose of valuation of property and contributions and to assess the cost against any or all parties to the action.

S.C.Code Ann. § 20–7–474 (Supp.2005).

■ The doctrine of equitable distribution is based on the recognition that marriage is, among other things, an economic partnership. *Morris v. Morris*, 335 S.C. 525, 530, 517 S.E.2d 720, 723 (Ct.App.1999); *Walker v. Walker*, 295 S.C. 286, 288, 368 S.E.2d 89, 90 (Ct.App.1988). It is well settled that in making an equitable distribution of marital property, the family court must (1) identify the marital property, real

and personal, to be divided between the parties, (2) determine the fair market value of the property so identified, (3) identify the proportionate contributions, both direct and indirect, of each party to the acquisition of the marital property, and (4) provide for an equitable division of the marital property. *Cannon v. Cannon,* 321 S.C. 44, 48, 467 S.E.2d 132, 134 (Ct.App.1996). Upon dissolution of a marriage, property acquired during the marriage should be divided and distributed in a manner which fairly reflects each spouse's contribution to its acquisition, regardless of which spouse holds legal title. *Nasser-Moghaddassi v. Moghaddassi,* 364 S.C. 182, 197, 612 S.E.2d 707, 715 (Ct.App.2005). The ultimate goal of apportionment is to divide the marital estate, as a whole, in a manner which fairly reflects each spouse's contribution to the economic partnership and also the relative effects of ending that partnership on each of the parties. *Johnson v. Johnson,* 296 S.C. 289, 298, 372 S.E.2d 107, 112 (Ct.App.1988). The family court has wide discretion in determining the contributions made by each spouse to the marital property. *Ball v. Ball,* 314 S.C. 445, 448 445 S.E.2d 449, 451 (1994).

Here, the family court judge properly concluded the contributions of each party, when considered as a whole, were equal in value. Though Husband unquestionably made the majority of the direct contributions to the marriage in terms of tangible assets, Wife made the majority of indirect contributions. In the beginning, both parties worked and contributed their respective salaries and income in support of the marriage. When Husband had an opportunity for professional advancement, Wife suspended her career and relocated. Wife worked at each new location until children were born and both parties agreed she would not continue outside employment. She maintained a household, enhanced the value of their home, performed social roles that benefited Husband's business, and had primary responsibility for the care of their three children.

The family court's ruling in the instant case is consistent with our precedent. We have previously held the family court's equal division of marital property was fair, even though the husband provided the majority of the income, where the wife was a homemaker and also worked outside the home, and her income assisted in meeting the family's needs. *Kirsch v. Kirsch,* 299 S.C. 201, 203, 383 S.E.2d 254, 255 (Ct.App.1989).

Similarly, we have concluded equal apportionment of the marital estate between the parties was equitable, even though most of the appreciation in the value of the assets was attributable to the husband's earnings and income during the marriage, where the wife faithfully performed her homemaker role during the marriage under the most trying of circumstances, and gave up her own career and dutifully contributed her labor to provide a good marital home for her husband. *Johnson*, 296 S.C. at 298–99, 372 S.E.2d at 112; *see also Harlan v. Harlan*, 300 S.C. 537, 541, 389 S.E.2d 165, 168 (Ct.App.1990) (awarding wife fifty percent interest in the marital residence was not error where the marriage lasted eighteen years, the wife worked a significant portion of that time, and the wife was also the primary caretaker of the children); *Smith v. Smith*, 294 S.C. 194, 200, 363 S.E.2d 404, 408 (Ct.App.1987) (awarding each party fifty percent of marital property despite expert's testimony that wife's contributions to accumulation of marital assets did not exceed thirty-seven percent was not error; trial court was not bound to accept expert's testimony regarding wife's contributions, and wife's testimony about her contributions indicated that during an eighteen-year marriage, wife provided homemaker services and on occasion worked either part-time or full-time, contributing monies she earned to support family); *Leatherwood v. Leatherwood*, 293 S.C. 148, 149, 359 S.E.2d 89, 90 (Ct.App. 1987) (awarding wife fifty percent of marital home, and fifty percent of joint savings account was not error; although husband made greater monetary contribution throughout marriage, wife did work at beginning of marriage, contributed her services as homemaker, and was therefore entitled to equitable interest in property acquired by wage-earner husband).

The family court judge did not err in finding each party's contributions, when considered as a whole, were equal in value. Consequently, the disposition of marital assets on a generally equal basis was not an abuse of discretion.

## B. Invasion of Husband's Assets for Temporary Support

Husband complains the family court erred in failing to consider that in order to pay Wife temporary support, he was forced to invade the assets he received as a result of equitable

distribution. Husband avers as a consequence his marital property distribution was substantially reduced.

 Factors to be considered in making an alimony award include: (1) duration of the marriage; (2) physical and emotional health of the parties; (3) educational background of the parties; (4) employment history and earning potential of the parties; (5) standard of living during the marriage; (6) current and reasonably anticipated earnings of the parties; (7) current and reasonably anticipated expenses of the parties; (8) marital and non-marital properties of the parties; (9) custody of children; (10) marital misconduct or fault; (11) tax consequences; (12) prior support obligations; and (13) other factors the court considers relevant. *Craig v. Craig*, 365 S.C. 285, 292, 617 S.E.2d 359, 361 (Ct.App.2005); *see* S.C.Code Ann. § 20-3-130(C) (Supp.2005). Generally, alimony should place the supported spouse, as nearly as practical, in the same position as enjoyed during the marriage. *Id.; Johnson*, 296 S.C. at 300, 372 S.E.2d at 113. "Alimony" is a substitute for the support which is normally incident to the marital relationship. *Craig*, 365 S.C. at 292, 617 S.E.2d at 362. An award of alimony rests within the sound discretion of the trial court and will not be disturbed on appeal absent abuse of discretion. *Allen v. Allen*, 347 S.C. 177, 183, 554 S.E.2d 421, 424 (Ct.App. 2001); *Doe v. Doe*, 319 S.C. 151, 155, 459 S.E.2d 892, 894–95 (Ct.App.1995).

 The family court judge found no basis for retroactive modification in the amount of temporary support awarded to Wife during the pendency of this case. We agree. Modification of alimony is within the sound discretion of family court and will not be overturned absent an abuse thereof. *Riggs v. Riggs*, 353 S.C. 230, 236, 578 S.E.2d 3, 6 (Ct.App.2003).

The April 10, 2002 temporary order incorporated the parties' agreement as to both the support and mortgage payments. At that time, six months remained during which Husband received a net $15,000.00 income from the New South severance package. Husband agreed to make the monthly mortgage payment and pay Wife $7500.00 per month in family support. Husband requested relief on these issues in an amended motion on September 2, 2002, but failed to file a financial declaration or appear at the motion hearing. In its

September 10, 2002 order, the family court reserved its ruling on modification of the April 10, 2002 temporary order pending review of Husband's financial declaration. By its order dated May 16, 2003, the family court found Husband's monthly income had been reduced warranting a modification of the April 10, 2002 temporary order. Husband was ordered to continue paying the monthly mortgage obligation, but his spousal support was reduced to $3000.00 per month, taxable to Wife and deductible by Husband. The September 10, 2003 order terminated Husband's spousal support and reduced his monthly mortgage payment by one-half. On final disposition, Wife was awarded the marital home and the responsibility for satisfying the mortgage debt. Wife did not seek permanent spousal support.

Husband alleges Wife enjoyed a $75,000.00 income during the entire pendency of these proceedings. However, according to the record, Wife only began work in April of 2003, more than a year after the commencement of this action and eleven months prior to the final hearing. Additionally, Husband either overlooks or misrepresents other pertinent facts in his argument for retroactive modification. The New South income from Husband's severance package continued through September of 2002. By order of the family court, Husband was to pay Wife $3000.00 from May of 2003 until the September 2003 order terminating all spousal support and one-half of the mortgage payment. At most, it appears Husband paid the $3000.00 for approximately five months, though he claims to have paid that amount monthly for a year and one-half. Prior to May, 2003, the April 10, 2002 temporary order ($7500.00 family support and full mortgage payment) was still in effect, presumably due, in part, to Husband's failure to file his financial declaration and failure to appear at the hearing on the motion requesting relief.

■ We discern nothing in the record to indicate the family court judge failed to consider the appropriate factors in determining temporary spousal support. Section 20–3–130(B)(6) affords the family court broad discretion in awarding alimony and allows the court to fashion an alimony award which is just under the circumstances. *Doe v. Doe*, 319 S.C. 151, 155, 459 S.E.2d 892, 895 (Ct.App.1995). "Our inquiry on appeal is not whether the family court gave the same weight

to particular factors as this court would have; rather, our inquiry extends only to whether the family court abused its considerable discretion in assigning weight to the applicable factors. No one factor is dispositive." *Pirri v. Pirri*, 369 S.C. 258, 631 S.E.2d 279, 284 (Ct.App.2006) (quoting *Allen v. Allen*, 347 S.C. 177, 186, 184, 554 S.E.2d 421, 425 (Ct.App.2001)).

## C. Award of Marital Home to Wife

■■■ Husband contends the family court erred in awarding Wife the marital home as part of the equitable division of marital property. We disagree.

■■■■ The disposition of the marital residence as part of the equitable distribution of marital assets is largely within the discretion of the family court. *Wooten v. Wooten*, 364 S.C. 532, 542, 615 S.E.2d 98, 103 (2005); *Nasser–Moghaddassi v. Moghaddassi*, 364 S.C. 182, 202, 612 S.E.2d 707, 718 (Ct.App. 2005). In order to effect an equitable apportionment, the family court may require the sale of marital property and a division of the proceeds. *Wooten*, 364 S.C. at 542, 615 S.E.2d at 103 (citing *Donahue v. Donahue*, 299 S.C. 353, 360, 384 S.E.2d 741, 745 (1989)). "Although the court is generally required to attempt an in-kind distribution of assets, an in-kind distribution of the marital home is not feasible." *Nasser–Moghaddassi*, 364 S.C. at 203, 612 S.E.2d at 718. "Accordingly, the court may either award the home to one of the parties, or order the home sold and the proceeds distributed." *Id.* Additionally, in deciding the disposition of the marital home, the family court must consider and give appropriate weight to the fifteen statutory factors. S.C.Code Ann. § 20–7–472 (Supp.2005).

In his final order the family court judge observed:

[t]here is compelling evidence to support Wife retaining the marital home as part of her share of the marital estate. This compelling evidence includes the desirability of maintaining the home for the minor children. With minor children who are 8, 5, and 4 years old, in a safe and comfortable home well-suited to their needs, which is the only home known to them, avoiding a sale of the marital home will enhance their stability and promote their best interests.

Conclusively, the family court judge, having given appropriate weight and consideration to the relevant statutory factors, did not abuse his discretion in awarding the marital residence to Wife.

### III. Child Support Calculation

 Husband challenges the family court's calculation of his child support obligation on the ground it erred by imputing income to Husband in the amount of $100,000.00. We have concluded the imputed amount was in error. Therefore, Husband is entitled to have child support recalculated and adjusted accordingly upon the family court's reassessment of Husband's imputed income.

Husband contends the family court erred by failing to consider substantial private school tuition in calculating child support under the child support guidelines.

 In determining the amount of child support, the family court is generally required to follow the child support guidelines. *Sexton v. Sexton,* 321 S.C. 487, 488, 469 S.E.2d 608, 609 (Ct.App.1996). Although the family court may deviate from the guidelines, any deviation must be justified and should be the exception rather than the rule. *Id.* Though the guidelines govern all actions involving questions of child support, the family court retains a certain amount of discretion when making the final award. *Woodall v. Woodall,* 322 S.C. 7, 13, 471 S.E.2d 154, 158 (1996).

"In any proceeding for the award of child support, there is a rebuttable presumption that the amount of the award which would result from the application of the guidelines required under Section 43–5–580(b) is the correct amount of child support to be awarded." S.C.Code Ann. § 20–7–852(A) (Supp. 2005). When a child support award varies significantly from the amount resulting from the application of the guidelines, the family court must make specific, written findings of those facts upon which it bases its conclusion supporting that award. Among the factors which the family court may consider to justify deviating from the guidelines are the educational expenses for the child or children, including those incurred for private school tuition and related costs. S.C.Code Ann. Regs. 114–4710 (Supp.2005).

In this case, the family court judge noted the application of the guidelines does not contemplate private school tuition. He found:

[t]he parties have historically placed their children in private school. Both parties find and believe private school is in the best interest of the children. Private school is within the financial ability of the parties. The annual tuition costs for all three children is currently $9,400.00. Wife requests Husband's participation in this expense, and for Husband to pay for miscellaneous fees, books, uniforms, and school lunches.

Consequently, the family court judge ordered Husband to pay Wife, on a monthly basis, fifty-seven percent of the children's private school tuition only. The miscellaneous fees Wife requested were deemed to be items included in the child support guidelines calculations. The family court judge's written findings clearly describe the nature and extent of the deviation and are sufficient to support this requirement.

## IV. Attorney's Fees

Husband claims the family court erred in awarding attorney's fees to Wife. We disagree.

Section 20–7–420(38) (Supp.2005) of the South Carolina Code provides that "Suit money, including attorney's fees, may be assessed for or against a party to an action brought in or subject to the jurisdiction of the family court."

An award of attorney's fees lies within the sound discretion of the family court and will not be disturbed on appeal absent an abuse of discretion. *Patel v. Patel*, 359 S.C. 515, 533, 599 S.E.2d 114, 123 (2004); *Bowen v. Bowen*, 327 S.C. 561, 563, 490 S.E.2d 271, 272, (Ct.App.1997). The family court, in determining whether to award attorney's fees, should consider each party's ability to pay his or her own fees, the beneficial results obtained, the parties' respective financial conditions, and the effect of the fee on the parties' standards of living. *E.D.M. v. T.A.M.*, 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992). In determining the reasonable amount of attorney's fees to award, the family court should consider the nature, extent, and difficulty of the services rendered, the time necessarily devoted to the case, counsel's professional stand-

ing, the contingency of compensation, the beneficial results obtained, and the customary legal fees for similar services. *Glasscock v. Glasscock,* 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991); *see also, Messer v. Messer,* 359 S.C. 614, 633, 598 S.E.2d 310, 320 (Ct.App.2004) (refusing to find an abuse of discretion as to award of attorney's fees when the family court analyzed each of the factors, detailed its findings in its final order, and those findings were supported by affidavits).

In his final order, the family court judge concluded:

Wife obtained beneficial results from this litigation. She secured the best interest of her children and obtained significant economic advantage as the result of the distribution of the marital assets and the payment of support. While both Husband and Wife have significant assets from which to pay their fees and suit costs, any fees or costs paid by Wife will adversely impact the parties' children and their standard of living.

The judge evaluated the reasonableness of Wife's attorney's fees and costs, her attorney's extensive experience and standing in the Bar, and the number of hours involved in this litigation against the backdrop of Husband's failure to cooperate with discovery, failure to cooperate with the guardian ad litem, and apparent failure to cooperate with his own attorney. We, therefore, affirm the family court's award of attorney's fees.

## WIFE'S APPEAL

### I. Future Profits from Sale of Marital Home

Wife asserts the family court erred in awarding Husband a share in the profits of the sale of the marital home if the sale occurred within six years from the date of the divorce decree and exceeded the $700,000.00 value of the home.

Family court judges have wide discretion in determining how marital property is to be distributed; they may use any reasonable means to divide property equitably, and their judgment will not be disturbed absent abuse of discretion. *Greene v. Greene,* 351 S.C. 329, 341, 569 S.E.2d 393, 400 (Ct.App.2002); *Murphy v. Murphy,* 319 S.C. 324, 329, 461 S.E.2d 39, 41 (citing *Peirson v. Calhoun,* 308 S.C. 246, 254, 417

S.E.2d 604, 608 (Ct.App.1992)). There are many factors which the family court may consider in the apportionment of marital property. On review, the appellate court looks to the fairness of the overall apportionment, and if the end result is equitable, the fact the appellate court may have weighed specific factors differently than the family court is irrelevant. *Pirayesh v. Pirayesh*, 359 S.C. 284, 300, 596 S.E.2d 505, 514 (Ct.App.2004); *Pool v. Pool*, 321 S.C. 84, 89, 467 S.E.2d 753, 756 (Ct.App.1996) *aff'd as modified*, 329 S.C. 324, 494 S.E.2d 820 (1998); *Johnson v. Johnson*, 296 S.C. 289, 300–01, 372 S.E.2d 107, 113 (Ct.App.1988)

The value of the marital home was the focus of considerable disagreement. Wife offered the testimony of a certified appraiser who opined the home had a fair market value of $700,000.00. Husband maintained the value was more accurately reflected by the sales price at which the home was marketed prior to this action. He believed the home had a fair market value of $825,000.00. In fashioning a remedy to account for the disputed value and potential additional equity in the home, the family court judge placed a condition on the award of the marital residence to Wife as part of equitable distribution. Given the judge's expressed concern that the property may be undervalued, he provided for Husband's share of profits from the sale of the marital home if the sale exceeded the Wife's valuation of $700,000.00 and occurred within six years from the date of the final order. Wife and Husband were to share equally in the profits, less the value of any direct contributions Wife made to the appreciation of the home. The family court retained jurisdiction to determine the value of any such contributions should the home sell within the six year period.

Wife argues this apportionment constituted a distribution of future non-marital assets that the family court had no authority to value or apportion. S.C.Code Ann. § 20–7–473 (Supp. 2005) ("The court does not have jurisdiction or authority to apportion nonmarital property.") We disagree. If, as the family court judge suspected, there was a difference between Wife's valuation of the marital home and its true fair market value, then that difference, represented by profit if the home is sold for over $700,000.00, was additional equity in the home and subject to equitable distribution. If the home was under-

valued, then the additional equity existed at the time the marital litigation commenced and was, therefore, marital property subject to equitable distribution. Section 20–7–473 defines marital property as "all real and personal property acquired by the parties during the marriage which is owned as of the date of filing or commencement of marital litigation, regardless of how legal title is held." S.C.Code Ann. § 20–7–473 (Supp.2005).

Awarding Husband a share in future profits prevents any injustice that might result from undervaluation. As Husband points out, the remedy provided is to ensure a fair determination of Husband's additional equity in the home and to provide for its distribution. The family court reasonably considered the unique circumstances in this case. The judge was within his discretion in fashioning a remedy to preclude potential inequity. The family court did not err in awarding Husband a share in the profits of the sale of the marital home if the sale occurred within six years from the date of the divorce decree and exceeded the $700,000.00 value of the home.

## II. Classification of Jewelry as Marital Property

Wife argues the family court erred in classifying all jewelry as marital property. We disagree.

Generally, property acquired by either party by gift from a party other than the spouse is nonmarital property. S.C.Code Ann. § 20–7–473(1) (Supp.2005). Nonmarital property may be transmuted into marital property if: (1) it becomes so commingled with marital property as to be untraceable; (2) it is jointly titled; or (3) it is utilized by the parties in support of the marriage or in some other manner so as to evidence an intent by the parties to make it marital property. *Jenkins v. Jenkins*, 345 S.C. 88, 98, 545 S.E.2d 531, 537 (Ct.App.2001) (citing *Pool*, 321 S.C. at 86, 467 S.E.2d at 756.). Transmutation of nonmarital property into marital property, for equitable distribution purposes, is a matter of intent to be gleaned from the facts of each case. *Id.* The spouse claiming an equitable interest in property upon dissolution of the marriage has the burden of proving that the property is part of the marital estate. If the spouse carries this burden, he or she establishes a prima facie case that the property is marital

property. If the opposing spouse then wishes to claim the property so identified is not part of the marital estate, he or she has the burden of presenting evidence to establish its nonmarital character. *Johnson v. Johnson,* 296 S.C. 289, 295, 372 S.E.2d 107, 111 (Ct.App.1988).

The family court judge instructed that Wife bore the burden of proving the jewelry in existence at the time of filing the marital litigation was owned prior to the marriage. Wife met that burden. Once it was established the jewelry was premarital, Husband bore the burden of proving transmutation in order for the jewelry to be considered marital. Husband met that burden by demonstrating that "the premarital items were mixed with other items of jewelry and modified using marital funds." Wife did not refute Husband's evidence. Therefore, the family court appropriately declared the jewelry marital property.

### III. Jurisdiction to Issue Supplemental Order

Wife contends the family court judge did not reserve jurisdiction to issue the Supplemental Order awarding guardian ad litem fees. The order was issued on September 29, 2004, after both the final order dated March 11, 2004 and the order addressing post trial motions dated August 2, 2004. Wife relies on our holding in *Heins v. Heins* where, pursuant to Rule 59(e) SCRCP, we held the family court did not have authority to alter or amend a judgment *sua sponte* once the judgment was more than ten days old. 344 S.C. 146, 157, 543 S.E.2d 224, 229 (Ct.App.2001). We find Wife's reliance on *Heins* in the present case misplaced.

First, we note the final order dated March 11, 2004 contains a provision retaining and reserving jurisdiction to issue any and all orders necessary to effectuate the terms of the order and to effectuate compliance with the terms of this order. Arguably, guardian ad litem fees were not terms of the March 11, 2004 order, but, in light of the judge's Supplemental Order and recent legislation, this court determines the exclusion of the term for payment of guardian fees was an oversight.

An award of guardian ad litem fees lies within the sound discretion of the family court judge and will not be disturbed on appeal absent an abuse of that discretion. *Nas-*

*ser–Moghaddassi v. Moghaddassi,* 364 S.C. 182, 196, 612 S.E.2d 707, 714 (Ct.App.2005). Section 20–7–1545 of the South Carolina Code provides that, in a private action in which custody or visitation is an issue, a guardian ad litem may be appointed when both parties consent to the appointment. S.C.Code Ann. § 20–7–1545 (Supp.2005). Additionally, section 20–7–1553 requires:

(A) At the time of appointment of a guardian ad litem, the family court judge must set forth the method and rate of compensation for the guardian ad litem, including an initial authorization of a fee based on the facts of the case. If the guardian ad litem determines that it is necessary to exceed the fee initially authorized by the judge, the guardian must provide notice to both parties and obtain the judge's written authorization of the consent of both parties to charge more than the initially authorized fee.

(B) A guardian appointed by the court is entitled to reasonable compensation, subject to the review and approval of the court. In determining the reasonableness of the fees and costs, the court must take into account:

(1) the complexity of the issues before the court;

(2) the contentiousness of the litigation;

(3) the time expended by the guardian;

(4) the expenses reasonably incurred by the guardian;

(5) the financial ability of each party to pay fees and costs; and

(6) any other factors the court considers necessary.

S.C.Code Ann. § 20–7–1553(A–B) (Supp.2005).

In light of the legislature's direction for compensating guardians ad litem, the judge's omission of a provision for guardian's fees was an oversight. Rule 60(a), SCRCP, provides in pertinent part:

[c]lerical mistakes in judgments, orders or other parts of the record and *errors therein arising from oversight or omission* may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, leave to correct the mistake must be obtained from the appellate court. The ending of a term of court or

departure from the circuit shall not operate to deprive the trial judge of jurisdiction to correct such mistakes.

(emphasis added). Therefore, the family court had jurisdiction to issue the September 29, 2004 Supplemental Order pursuant to Rule 60(a) SCRCP.

## CONCLUSION

We affirm the ruling of the family court in regard to:

(1) the parties' contributions to the marriage;

(2) the invasion of Husband's assets for temporary support;

(3) the award of the marital home to Wife;

(4) Husband's share of children's private school tuition;

(5) Husband's share in future profits from the sale of the marital home;

(6) the classification of Wife's jewelry as marital property; and

(7) the award of guardian fees in the Supplemental Order.

We reverse the holding of the family court in reference to the *amount* of income imputed to Husband and remand for a determination consistent with this opinion as it relates to the calculation of the child support award.

**AFFIRMED IN PART, REVERSED IN PART and RE-MANDED.**

SHORT, J., and CURETON, A.J., concur.